Nicole Owens
EXECUTIVE DIRECTOR
Christopher M. Sanchez, Idaho Bar No. 12070
Jonah J. Horwitz, Idaho Bar No. 10494
Deborah A. Czuba, ID Bar No. 9648
Mary E. Spears, IN Bar No. 27353-49
Nicole R. Gabriel, ID Bar No. 11603
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:  Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org
        Deborah_A_Czuba@fd.org
        Mary_Spears@fd.org
        Nicole_Gabriel@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH,** | ) | **CASE NO.** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT FOR** |
| | ) | **EQUITABLE, DECLARATORY,** |
| **IDAHO COMMISSION OF PARDONS** | ) | **AND INJUNCTIVE RELIEF** |
| **AND PAROLE; JAN M. BENNETTS**, | ) | |
| Ada County Prosecuting Attorney, in her | ) | |
| official capacity;, | ) | **EXECUTION SCHEDULED** |
| | ) | **FOR FEBRUARY 28, 2024** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

COMPLAINT – Page 1

## I.     Nature of the Action

1.     Plaintiff Thomas Eugene Creech is a death-row inmate in Idaho who brings this action pursuant to 42 U.S.C. § 1983 for violations of his constitutional right to due process of law in his clemency proceeding.

2.     Mr. Creech hereby seeks injunctive and declaratory relief prohibiting his execution until the harms against him can be rectified through a new clemency proceeding in which, inter alia, (1) the prosecution[1] is forbidden from using false evidence against him; (2) Mr. Creech is given notice of what the Idaho Commission of Pardons and Parole (hereinafter "the Commission") will consider in its decision; (3) he is given notice of the evidence to be used against him by the prosecution; and (4) he is given a reasonable amount of time to investigate the prosecution's new claims raised for the first time at his clemency hearing.

## II.     Justiciable Case or Controversy

3.     For the reasons set forth below, absent judicial intervention, Mr. Creech will be executed in violation of his constitutional and statutory rights.

4.     There is a real and justiciable case or controversy between the parties.

## III.     Jurisdiction and Venue

5.     This action arises under 42 U.S.C. § 1983.

---

[1] As the prosecution took the lead in representing the State of Idaho against Mr. Creech—counsel from the Attorney General's Office sat in as co-counsel—the plaintiff may refer to the prosecution as "Idaho," "the State of Idaho," "the State," the "prosecutor," and so forth. Likewise, throughout this complaint, the plaintiff refers to all the defendants, variously, as "the defendants." The use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

6.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

7.     The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

8.     Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including the clemency proceedings and Mr. Creech's impending execution—have occurred, are occurring, or will occur in the District of Idaho.

9.     Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

**IV.    Parties**

10.     Mr. Creech is a person within the jurisdiction of the State of Idaho.

11.     Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

12.     Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

13.     Mr. Creech is under sentence of death.

COMPLAINT – Page 3

14.     As set forth in greater detail below, the defendants are state officials responsible for overseeing Mr. Creech's clemency proceeding and/or prosecuting and representing the interests of the State in executing Mr. Creech in Idaho.

15.     Defendant Idaho Commission of Pardons and Parole ("Commission") is the agency responsible for making the initial determination with respect to petitions for commutation by death-row inmates.

16.     The Commission was responsible for deciding what information to consider in Mr. Creech's commutation proceedings, notifying the parties of the nature of that information, and providing the parties with an opportunity to respond to that information.

17.     Defendant Jan M. Bennetts is the elected Ada County Prosecuting Attorney.

18.     As such, Ms. Bennetts is the head of the Ada County Prosecutor's Office ("ACPO").

19.     The ACPO was given the primary responsibility in representing the State's interests in executing Mr. Creech in the commutation proceedings.

20.     Upon information and belief, the plaintiff and the defendants are all United States citizens.

21.     The defendants are all officials or representatives of the State of Idaho.

22.     All of the actions that have been and will be taken by the defendants towards executing Mr. Creech and any other actions at issue in this complaint were or will be taken under color of state law.

COMPLAINT – Page 4

23.     The defendants are all sued in their official capacities.

## V.   General Factual Allegations

24.     Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

25.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

26.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

27.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

28.     The new death sentence was upheld on direct appeal in 1998.

29.     Once the State obtains a death warrant, which in this case it did on January 30, 2024, it has thirty days to execute Mr. Creech.

30.     Mr. Creech is scheduled to be executed on February 28, 2024.

31.     Mr. Creech brings this action to challenge his execution because the Commission failed to comply with minimal due process requirements by accepting and considering the prosecution's last-minute false statements and questionable evidence without allowing Mr. Creech a chance to investigate and demonstrate the prosecution's misrepresentations. Likewise, Mr. Creech brings this action against the prosecution because it too violated due process through misrepresentations and the use of questionable evidence, as well as its failure to provide Mr. Creech with any notice of this evidence.

A.      **Clemency Proceedings and the Failure to Notify Mr. Creech of Evidence the Commission Would Consider and the Prosecution Would Raise**

32.      Before the State obtained the most recent death warrant, it obtained a warrant on October 12, 2023, setting Mr. Creech's execution for November 8, 2023.

33.      Mr. Creech filed his petition for commutation with the Commission the next day, on October 13, 2023, asking for his death sentence to be reduced to life in prison without the possibility of parole.

34.      On October 18, 2023, the Commission voted in favor of granting Mr. Creech a commutation hearing.

35.      The Commission scheduled the commutation hearing for January 19, 2024.

36.      The parties met with the Commission's Executive Director Ashley Dowell on November 7, 2023, to discuss the hearing.

37.      Director Dowell sent a letter to the parties on November 13, 2023, to memorialize the November 7 meeting.

38.      This letter outlined the rules and logistical details for the hearing and noted that the Ada County Prosecuting Attorney's Office, rather than the Attorney General's Office, would be the "primary point of contact for the State's case."

39.      The Commission's investigators interviewed Mr. Creech on November 8, 2023.

40.      The Commission investigators filed a report with the Commission on December 19, 2023.

COMPLAINT – Page 6

41.     After the parties had submitted materials for the Commission's consideration, the Commission made all materials provided by the State, Mr. Creech, and the Commission's investigators available to both sides in a "hearing packet" on December 20, 2023.

42.     The State's section of the hearing packet consisted of 2,952 pages of documents.

43.     The first 27 pages of the State's materials, however, were removed from the copy given to counsel for Mr. Creech with the following text: "THIS PAGE REMOVED DUE TO EXTRACTION OF VICTIM RELATED DOCUMENTS."

44.     Upon information, these pages may have included a letter from a man named Doug Walker whose brother Daniel Walker had been killed in San Bernardino, California in 1974.

45.     Counsel for Mr. Creech have never seen these first 27 pages.

46.     When Mr. Creech refers to the packet here, he is referencing the pages that were made available to him.

47.     Among all the State's 2,952 pages that were provided to Mr. Creech, there was no reference to Daniel Walker ("Mr. Walker").

48.     Mr. Walker's name was also absent from the report prepared by the Commission's investigators, as well as Mr. Creech's 1994 presentence investigation report—both of which were also in the hearing packet.

49.     Additionally absent from the State's materials were any photographs of socks.

COMPLAINT – Page 7

50.     To undersigned counsel's knowledge, the State did not supplement any of its materials between December 20, 2023, and the day of the hearing on January 19, 2024.

**B.     The Prosecution Tells the Commission Mr. Walker's Murder Has Been Solved and the Killer was Mr. Creech**

51.     At the commutation hearing on January 19, 2024, the ACPO took the position that the Commission should not commute Mr. Creech's death sentence.

52.     To support its position that Mr. Creech should be executed, the prosecution told the Commission that just a week before the hearing, authorities in San Bernardino, California had solved Daniel Walker's murder and that Mr. Creech was responsible for it.

53.     The prosecutor noted as well that Mr. Creech had always been a suspect in the case.

54.     Undersigned counsel are attorneys with the Capital Habeas Unit for Federal Defender Services of Idaho ("CHU").

55.     The CHU has represented Mr. Creech since 1999 and has had primary responsibility over the last twenty-five years for handling his federal habeas and state post-conviction litigation.

56.     In connection with its representation, the CHU has maintained an exhaustive file on every document it has obtained from Mr. Creech's prior attorneys as well as from public record requests, court filings, and so forth.

57.     The CHU's file does not contain any reference to Mr. Walker by name.

58.     To undersigned counsel's knowledge, until the commutation hearing, no prosecutor from the ACPO had ever suggested publicly that Mr. Creech was involved in the murder of Mr. Walker.

59.     No charges have ever been filed against Mr. Creech in connection with the Walker case.

60.     At the commutation hearing, the ACPO told the Commission that Mr. Creech was guilty of the 1974 Walker murder and that the case was closed.

61.     On information and belief, the prosecutor's slides included an image of the book Doug Walker wrote about the murder case, which is described below, and the slides also included the date of his brother's death.

62.     The ACPO further indicated that the Commission should consider this new information in support of a decision to deny Mr. Creech's clemency petition.

63.     The same day as the commutation hearing, the ACPO issued a press release, which included the following statement: "Earlier this week, a cold case was solved in San Bernardino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974."

64.     Both the press release and the prosecutor's statement to the commission were untrue.

65.     The case was not "solved."

66.     When the San Bernardino Sheriff's Department ("SBSD") issued a press release on January 24, 2024, it announced that Mr. Creech had been "identified as the *suspect* in the 1974 murder of Daniel Walker along Interstate 40."

67.     The SBSD release elaborated that its Cold Case Team "resumed the investigation" into the murder on November 15, 2023.

68.      It was, the release went on, only after "working with the Ada County District Attorney's Office [sic] in Idaho, [that] Cold Case Detectives were able to corroborate intimate details from statements Creech made regarding Daniel's murder."

69.     To undersigned counsel's knowledge, there has been no public explanation as to what these intimate details were, when they were made, and what changed in SBSD's investigation from the mid-1970s to the present.

70.     What is clear from the SBSD release is that the case has not been conclusively solved.

71.     Mr. Creech was named only as a "suspect," and the SBSD release ended by requesting that people contact the Cold Case Team if they have any additional information.

72.     The SBSD's release suggests the case remains open.

73.     The ACPO presented false evidence when it stated to the Commission that the Walker case was closed.

74.     The ACPO's additional claim that the case had been solved after a "thorough investigation" is also a misrepresentation.

COMPLAINT – Page 10

75.   There is no new evidence tying Mr. Creech to the murder of Daniel Walker.

76.   Records that have been in Mr. Creech's file for decades indicate that SBSD had sent an investigator to Idaho in 1975 to question Mr. Creech about possible killings Mr. Creech had done in San Bernardino back in 1975.

77.   On April 28, 1975, a Detective Dykes from SBSD questioned Mr. Creech alongside Ada County Sheriff Eldon "Chuck" Palmer.

78.   The questioning on April 28, 1975 was recorded and transcribed.

79.   Mr. Walker's name is never mentioned in the transcript.

80.   Only Sheriff Palmer and Detective Dykes are noted as being present with Mr. Creech during the interview in the transcript.

81.   During the interview there are references to what appears to have been an interview of Mr. Creech involving Detective Dykes the day before, April 27, 1975.

82.   There are several references in the April 28, 1975, transcript that indicate both Detective Dykes and Sheriff Palmer had discussed the killings with Mr. Creech the day before.

83.   Counsel has been unable to locate a recording or transcription of the April 27, 1975, interview.

84.   In the transcript of the April 28, 1975, interview, Mr. Creech tells Detective Dykes and Sheriff Palmer elaborate stories about six people he claimed either he or his 17-year-old girlfriend Carol Spaulding killed in San Bernardino.

COMPLAINT – Page 11

85.     For many of these victims, Mr. Creech gives very specific directions to where he hid the bodies in the local mines.

86.     One of the six victims includes a young man in a van.

87.     He gives Detective Dykes and Sheriff Palmer various details about the killing of this man in a van: Mr. Creech tells them he was driving a "goldish" colored van; this van got stuck on the side of the freeway earlier and a truck driver helped them; they first encountered the victim when Ms. Spaulding was shopping for groceries by herself and the victim made a pass at her; they ended up running into the victim later on their trip; Mr. Creech used a shotgun in the killing; and he stole a few traveler's checks from the victim.

88.     By the time of the April 28, 1975 interview, all of the details that overlap between Mr. Creech's account and the Walker case were already widely publicized on television news programs, in newspaper stories, and paid advertisements as investigators and Mr. Walker's family sought the public's help in solving the crime. These details included the presence of a gold van, a shotgun as the weapon, and the theft of traveler's checks.

89.     It is therefore clear, under the circumstances, that Detective Dykes had in mind the Walker case when he was questioning Mr. Creech.

90.     At the commutation hearing, the prosecutor noted that Daniel Walker's brother Doug Walker recently published a book about the unsolved murder entitled *Daniel, My Brother: Mystery in the Mojave*, in October 2023.

91.     According to Doug Walker's book, Daniel Walker was driving a Volkswagen van when he was killed.

92.     The book further reports that a hitchhiker named Ken Robinson was in Mr. Walker's van when the killing occurred, and he described two men in a gold GMC or Chevy van as the murderers. He also got the impression that Mr. Walker knew the killers.

93.     As Doug Walker's book recounts, police later spoke with a beer truck driver who believed he had helped the murderers with their stuck vehicle an hour before the killing. This driver also described two men, one of whom was named "Sam." The truck driver further recalled the men told him they were heading to Indiana to meet up with an ex-wife or child of one of the men.

94.     Mr. Creech, in the April 28, 1975, interview, does not say he and Carol Spaulding were traveling with another man, and he is unable to remember what type of van the victim was driving despite the unique design of a Volkswagen van in comparison to others.

95.     During the same period of time, Ms. Spaulding was questioned twice by law enforcement under circumstances that make clear that law enforcement were exploring the Walker crime.

96.     At those two interviews, Ms. Spaulding denied the allegations and informed the officers that it sounded to her like Mr. Creech was fabricating his involvement in the crime.

COMPLAINT – Page 13

97.     Immediately after talking about the van murder, Mr. Creech launches into telling Detective Dykes and Sheriff Plamer about a ranch in Malibu, California owned by vegetarian Satanists who had a practice of advertising in the newspaper for hitchhikers who would unwittingly be used for human sacrifices.

98.     In early May 1975, Sheriff Palmer, Ada County Deputy Sheriff Tom Taylor, and Idaho State Police Investigator Bud Mason all flew to San Bernardino with Mr. Creech.

99.     The purpose of this trip was to aid the SBSD in locating the several bodies Mr. Creech claimed to have hidden in the area.

100.    There may have been further questioning about the Walker murder during this trip as well.

101.    Upon information, the Sheriff gave Mr. Creech special treatment in exchange for helping law enforcement, such as providing him with beer while they drove around looking for bodies that Mr. Creech claimed to have hidden in the local mines.

102.    Mr. Creech therefore had an incentive to tell law enforcement about bodies that did not exist.

103.    The May 1975 trip to San Bernardino was unsuccessful and they did not recover a single body.

104.    After all this, Detective Dykes and SBSD appear to have ruled Mr. Creech out as a suspect in Mr. Walker's murder despite his confession.

COMPLAINT – Page 14

105.    That is because Mr. Creech was never charged, prosecuted, or convicted for any killings in San Bernardino, or even publicly named as a suspect at the time.

106.    During the same period of time, law enforcement officials publicly linked Mr. Creech to dozens of murders, some real and others of people who seem to never have existed or who were found in good health.

107.    So far as undersigned counsel are aware, there is only one hint suggesting the existence of any information supposedly linking Mr. Creech to the Walker murder separate from the April 28, 1975 interview.

108.    That hint comes from Mr. Taylor's letter to the Commission, which was included in the ACPO's submissions that were made part of the hearing packet.

109.    In his letter dated December 14, 2023, Mr. Taylor claims that he was present for interviews where Mr. Creech described killing a man in a van in the Barstow, California area who had a diamond ring.

110.    The April 28 transcript does not refer to a diamond ring.

111.    Counsel conducted a thorough and extensive search of their file and found no reports by Mr. Taylor or any references to one.

112.    The only transcript of an interview on the subject of San Bernardino murders in counsel's file is the April 28 transcript and Mr. Taylor is not recorded as being present.

113.    It is not clear whether there is any information tying Mr. Creech to the Walker case other than an interview conducted nearly fifty years ago and the

COMPLAINT – Page 15

apparently rediscovered recollections of Mr. Taylor of conversations taking place decades earlier.

114.   Shortly after the commutation hearing, undersigned counsel filed a public records request with the SBSD, which has informed counsel that it will need a fourteen-day extension and will not respond until February 15, 2024.

115.   It is already clear, however, that after the trip to San Bernardino in May 1975, the SBSD decided not to pursue their investigation into Mr. Creech even after he had offered a confession to one of their detectives.

116.   Apart from the memory Mr. Taylor apparently recovered shortly before Mr. Creech's commutation hearing, no new information has been shared with Mr. Creech or the public that links Mr. Creech to the Walker murder.

117.   Instead, the "thorough investigation," referred to by the prosecutor in her press release, appears to have been reminding the SBSD about what Mr. Creech told Detective Dykes in 1975, perhaps supplemented by Mr. Taylor's new memory.

118.   According to the SBSD press release, the SBPO is in close contact with Ada County.

119.   There has been no word that the SBPO will seek to prosecute Mr. Creech.

120.   Instead, both the SBPO and the SBSD will be spared the burden of offering any proof to the public or to a court once Mr. Creech has been executed.

121.    Here, in any case, the prosecutor at Mr. Creech's clemency hearing offered no new evidence and did not share the fruits of any thorough investigation with the Commission.

122.    Nevertheless, the prosecutor declared before the Commission that the Walker case had been closed.

123.    The prosecutor told the Commission the case had been solved.

124.    The prosecutor told the Commission that Mr. Creech was guilty of murdering Mr. Walker.

125.    The Commission considered the prosecution's false and unverified claims in its decision.

126.    Undersigned counsel made several requests that the Commission postpone its decision until Mr. Creech could gather information about the Walker case.

127.    On January 22, 2024, counsel notified the Commission about the issues surrounding the State's claims regarding the Walker case and asked that it wait two months before reaching a decision so counsel could conduct an investigation into the State's new accusation.

128.    Then, on January 25, 2024, counsel updated the Commission on the discrepancy between the prosecution's statements and the SBSD press release as to whether the case was "closed." Counsel also informed the Commission that his office had timely sent out public records requests related to the Walker investigation. For

both of these reasons, counsel renewed the request for two months to complete an investigation and respond to these new allegations.

129.    On January 26, 2024, Deputy Attorney General L. LaMont Anderson stated in a letter to the Commission that there is additional information linking Mr. Creech to the Walker murder undisclosed in the public statements referenced above.

130.    This additional information has, to date, never been turned over to Mr. Creech, the Commission, or the public.

131.    Finally, on January 29, 2024, counsel provided the Commission with a letter and attachments further demonstrating the need for a short period of time to gather more information about the San Bernardino allegation.

132.    These requests were denied.

133.    The Commission made a final decision on Mr. Creech's commutation petition on January 29, 2024, after receiving the last letter from undersigned counsel.

134.    The decision was a 3-3 tie, which the Commission regarded as a denial of the petition.

135.    The seventh Commissioner recused himself from the proceedings for reasons that were never conveyed to undersigned counsel.

136.    With this recusal, Mr. Creech still had to convince four of the now six Commissioners, while the State only had to get three Commissioners to support execution.

137.   The recusal only harmed Mr. Creech.

138.   The Commission did not seek an alternate Commissioner to sit in on the case so there would be an odd number of Commissioners to avoid a tie.

139.   Nor did the Commission remove a Commissioner from the panel so that each side would have to convince three members in order to obtain a majority and prevail.

140.   Three Commissioners believed that clemency was appropriate and only three felt it was unwarranted. Nevertheless, the Commission decided to deny the petition rather than seek a tie-breaking vote from either the Executive Director or an alternate Commissioner.

141.   Had seven Commissioners been present for Mr. Creech's hearing, as was supposed to be the case, then he would have had the chance to persuade one more person to vote for life.

142.   Instead, the prosecution only needed to win half the votes of the Commissioners, while Mr. Creech had to win two thirds.

143.   Idaho law provides that there are seven Commissioners.

144.   Under the Idaho Constitution, a majority of votes in favor of a commutation are necessary in order to secure a favorable recommendation from the Commission to the Governor.

145.   Idaho's scheme therefore envisions that each side in a capital commutation hearing must convince four Commissioners to vote for their position.

146.   Mr. Creech had a reasonable expectation that such a balanced approach would be followed in his case.

147.   That reasonable expectation was unmet because of the unexplained recusal and the subsequent 3-3 vote.

148.   The prosecution obtained a death warrant the next day and is intent on killing Mr. Creech on February 28, 2024, before the truth about the Walker case surfaces.

149.   In the United States, everyone has the right to a trial by jury. The prosecution here stole that right from Mr. Creech in a matter of minutes when it charged him, tried him, and convicted him of killing Daniel Walker in the mere moments it took to change a slide in their PowerPoint presentation. This irresponsible and unfair abuse of power was intentionally designed to rob Mr. Creech of what was clearly a strong bid for clemency.

## C.   The Prosecution Reveals a Photo of the Murder Weapon for the First Time Before the Commission

150.   The fight that led to the death of David Jensen began when Mr. Jensen attacked Mr. Creech with a sock filled with batteries.

151.   Mr. Creech took the weapon away from Mr. Jensen, who returned to his cell and brought back a toothbrush with a razor blade attached.

152.   The fight continued until Mr. Creech hit Mr. Jensen with the battery-filled sock several times.

153.   The sock broke open and some of the batteries fell out.

COMPLAINT – Page 20

154.    Over the last forty-three years, there have been two main theories for where the sock originated: under one account Mr. Creech provided Mr. Jensen with the sock and under a different account it was another inmate who provided the sock.

155.    The answer would have been of great importance throughout the case because it would have either helped the State show Mr. Creech planned the whole assault out in advance, as the prosecution posited, or it would have shown that some other inmate set the scheme in motion, which was one of Mr. Creech's main arguments.

156.    This dispute was particularly critical in the yearslong litigation over whether Mr. Creech was entitled to withdraw his guilty plea on the ground that his trial attorney never advised him properly about the nature of self defense.

157.    During the entire history of Mr. Creech's case, to undersigned counsel's knowledge, no one until the commutation hearing had ever maintained or even suggested the sock had Mr. Creech's name written on it.

158.    To undersigned counsel's knowledge, none of the police reports surrounding the murder note that Mr. Creech's name is written on the sock.

159.    Detective Dan Douthit was responsible for collecting evidence at the crime scene.

160.    The official police report states that police collected "a white sock with five D cell batteries in it. There was a small amount of blood on the sock."

COMPLAINT – Page 21

161.    The police were looking for evidence that the sock had belonged to Mr. Creech.

162.    The official police report states the following: "Prior to our departure, R/O along with Lt. Carr, went in and searched suspect Creech's belongings. We were looking for a matching sock to the one that was used to carry the batteries, since we could not find one in the victim's cell. We came up with three white socks, two matching, one odd. The odd one looked, to this officer, to be the matching sock to the one that was used to carry batteries."

163.    Even though there was a clear incentive to prove the sock belonged to Mr. Creech, no report states that the sock collected from the crime scene had his name written on it.

164.    The commutation hearing on January 19, 2024, was the first time that changed when the prosecutor showed the Commission a slide with an image of a sock with Mr. Creech's name allegedly written on it in marker.

165.    This image was not included in the State's section of the hearing packet that was made available in advance to undersigned counsel.

166.    Previous attempts by undersigned counsel's office to access any of the relevant materials had been denied over the years, including when, on July 7, 1999, the Ada County Sheriff's Office refused to make any evidence available to the CHU.

167.    Mr. Creech was represented during his guilty-plea proceedings in the 1980s and again at his 1995 resentencing by attorney Rolf Kehne.

168.   Mr. Kehne does not recall ever seeing or hearing about Mr. Creech's name written on the sock.

169.   Undersigned counsel filed a motion with the state district court to access the sock on January 25, 2024.

170.   This motion remains pending and will be heard on February 15, 2024.

171.   On January 26, 2024, the ACPO provided undersigned counsel with a copy of the slide of the sock that prosecution used during its presentation.

172.   There appear to be discrepancies between the image of the sock in the prosecutor's slide and images taken of the sock from the crime scene.

173.   The socks in the images appear to have multiple differences including the stains on them, the size, and the style of sock.

174.   The discoloration in the prosecutor's image does not seem consistent with discoloration caused by the blood in the crime-scene photograph.

175.   It also appears the sock in the prosecutor's image is a crew length while the one in the crime scene photo appears to be a longer, calf-length sock.

176.   Undersigned counsel sent the Commission letters on January 22, 2024, January 25, 2024, and January 29, 2024, notifying it of the facts above regarding the prosecutor's image, including that he had filed a motion with the state district court for access to the sock. As a result, counsel asked the Commission for two months so counsel could review the new evidence presented by the prosecutor on the day of the commutation hearing.

COMPLAINT – Page 23

177.    Counsel's request was denied, and the Commission considered this questionable evidence against Mr. Creech in reaching its decision.

## VI.    Claim 1—Defendants Violated Due Process

178.    Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

179.    The Due Process Clause of the Fourteenth Amendment applies to clemency proceedings. *See Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1988) (O'Connor, J., concurring); *see also id.* at 290–91 (Stevens, J., concurring in part). At a minimum, due process in clemency proceedings requires advance notice and a chance to contest evidence that will be presented against a petitioner. *Swarthout v. Cooke*, 562 U.S. 216, 220 (2011). Similarly, in the clemency context, "a lack of adequate notice of the issues to be considered implicates a fundamental right of due process." *Wilson v. U.S. Dist. Court*, 161 F.3d 1185, 1187 (9th Cir. 1998) (citing *Lankford v. Idaho*, 500 U.S. 110, 126 (1991) and *Woodard*, 523 U.S. at 288). Furthermore, "the deliberate fabrication of false evidence" is unacceptable in clemency proceedings under the Due Process Clause. *Woodard*, 523 U.S. at 291 (Stevens, J., concurring in part).

180.    By virtue of the above stated facts, defendants deprived Mr. Creech of his constitutional right to due process of law by (1) failing to give him adequate notice of the allegations and evidence the prosecution would present; (2) presenting false evidence against him regarding the murder of Daniel Walker and the status of San Bernardino's investigation into the crime; (3) presenting potentially tampered

with evidence in the form of an image of a sock with Mr. Creech's name written on it; (4) failing to give notice that the prosecution would be using the image of the sock in its presentation and failing to make examination of the sock available to Mr. Creech prior to the hearing; (5) failing to allow Mr. Creech the chance to contest the evidence against him once he had informed the Commission of the issues with the prosecution's presentation; and (6) denying Mr. Creech's petition on the basis of a tie vote when he had a reasonable expectation that each side would be required to persuade the same name of Commissioners to secure a favorable outcome.

181.    In sum, the prosecution created the illusion of a new murder conviction as it prepared for the commutation hearing. Then, for the first time at the hearing, the prosecution revealed never-before-seen images of the murder weapon that mysteriously appeared as the prosecution prepared for the commutation hearing. The prosecution gave no notice before presenting either the image of the sock or its false statement about the Walker murder to the Commission. Then, the Commission, once on notice of the prosecution's due process violations, refused to allow Mr. Creech time to respond to the new, suspicious, and, at a minimum in regards to the Walker case, objectively false information from the prosecution.

## VII.   Prayer for Relief

182.    In light of the above, Mr. Creech respectfully requests that the Court:

    a)  Stay the February 28, 2024 death warrant against Mr. Creech.

b)  Enjoin the State from seeking a death warrant until Mr. Creech has a reasonable time to investigate the prosecution's claims during the commutation hearing.

c)  Order the Commission to provide Mr. Creech with a new hearing with adequate notice of the issues the Commission will consider and adequate notice of the evidence the prosecution will use against him; or, in the alternative, order the Commission to withdraw its decision and consider any information Mr. Creech is able to present within a reasonable amount of time before making a final determination.

d)  Enjoin the defendants from attempting to execute Mr. Creech until this Court orders otherwise.

e)  Declare that Mr. Creech's commutation proceedings were unconstitutional and that the Commission's denial of his petition was therefore legally invalid.

f)  Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Creech to prove his claim.

g)  Grant any such other relief that is just and proper.

DATED this 5th day of February 2024.

/s/ *Christopher M. Sanchez*
Christopher M. Sanchez
Jonah J. Horwitz
Deborah A. Czuba
Mary E. Spears
Nicole R. Gabriel

*Attorneys for Plaintiff*