No. _____

**In the United States Court of Appeals
for the Ninth Circuit**

*In re* THOMAS EUGENE CREECH,

Plaintiff–Petitioner,

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO,

Respondent,

IDAHO COMMISSION OF PARDONS AND PAROLE

AND JAN M. BENNETTS, Ada County Prosecuting Attorney, in her official capacity,

Real Parties in Interest.

From the United States District Court for the
District of Idaho in Case No. 1:24-cv-00066-AKB,
The Honorable Amanda K. Brailsford

**PETITION FOR WRIT OF MANDAMUS**

**CAPITAL CASE**

Jonah J. Horwitz, ID Bar No. 10494
Christopher M. Sanchez, ID Bar No. 12070
Assistant Federal Defenders
Federal Defender Services of Idaho
702 W. Idaho St., Ste. 900, Boise, ID 83702
Tel: (208) 331-5530; Fax: (208) 331-5559
ECF: Jonah_Horwitz@fd.org
       Christopher_M_Sanchez@fd.org
Attorneys for Plaintiff-Petitioner Mr. Creech

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES ...........................................................ii

INTRODUCTION........................................................................ 1

STATEMENT OF THE CASE ....................................................... 2

ARGUMENT ............................................................................ 7

I.      Mandamus is an appropriate vehicle. ................................ 7

II.     Mandamus relief is warranted......................................... 8

        A.      The friendship creates an appearance of partiality. ...................9

        B.      The prior recusal creates an appearance of partiality. ..............11

        C.      Ms. Bennetts is implicated by the allegations. ........................15

        D.      Judge Brailsford's *Baker* opinion is irrelevant. ......................21

        E.      The unique posture of the case favors recusal.........................23

CONCLUSION.......................................................................... 29

STATEMENT OF RELATED CASES .......................................... 30

CERTIFICATE OF COMPLIANCE ............................................ 31

CERTIFICATE OF SERVICE..................................................... 32

# TABLE OF AUTHORITIES

**Federal Cases**                                                              **Page(s)**

*In re Al-Nashiri*,
  921 F.3d 224 (D.C. Cir. 2019) ................................................... 8, 14-15, 17, 24

*Alexander v. Primerica Holdings*,
  Inc., 10 F.3d 155 (3d Cir. 1993) .......................................................... 8

*Atkins v. Virginia*,
  536 U.S. 304 (2002) (Scalia, J., dissenting) ................................................ 23, 24

*Berger v. United States*,
  295 U.S. 78 (1935) ...................................................................... 27

*California v. Ramos*,
  463 U.S. 992 (1983) ..................................................................... 24

*Carter v. DeKalb Cnty.*,
  521 F. App'x 725 (11th Cir. 2013) (per curiam) ....................................... 19, 20

*Cordoza v. Pac. States Steel Corp.*,
  320 F.3d 989 (9th Cir. 2003) ......................................................... 7, 9, 10

*Creech v. Idaho Comm'n of Pardons & Parole*,
  94 F.4th 851 (9th Cir. 2024) (per curiam) ................................................... 6

*Creech v. Idaho Comm'n of Pardons & Parole*,
  144 S. Ct. 1027 (2024) ...................................................................... 6

*Diversified Numismatics*, Inc. *v. City of Orlando*,
  Fla., 949 F.2d 382 (11th Cir. 1991) .................................................. 12, 14

*Echavarria v. Filson*,
  896 F.3d 1118 (9th Cir. 2018) .......................................................... 17

*Frlekin v. Apple, Inc.*,
  979 F.3d 639 (9th Cir. 2020) .......................................................... 2, 3

*In re Gibson*,
  950 F.3d 919 (7th Cir. 2019) .............................................................. 8

*Gladstein v. McLaughlin*,
230 F.2d 762 (9th Cir. 1955) ............................................................... 8

*Gregg v. Georgia*,
428 U.S. 153 (1976) (plurality op.) .................................................... 23

*Hawkins v. Christensen*,
No. 1:13-cv-321, 2022 WL 60667 (D. Idaho Jan. 6, 2022) ............................ 26

*In re IBM*,
45 F.3d 641 (2d Cir. 1995) ......................................................... 9, 10

*Kehne v. Arave*,
18 F.3d 656 (9th Cir. 1994) (per curiam) .......................................... 18

*King v. U.S. Dist. Ct.*,
16 F.3d 992 (9th Cir. 1994) ...................................................... 7-8

*Lambright v. Stewart*,
191 F.3d 1181 (9th Cir. 1999) ....................................................... 24

*Liteky v. United States*,
510 U.S. 540 (1994) .................................................................. 9

*Moran v. Clarke*,
296 F.3d 638 (8th Cir. 2002) (en banc) ............................................ 10

*In re Murchison*,
349 U.S. 133 (1955) ................................................................. 23

*In re Nettles*,
394 F.3d 1001 (7th Cir. 2005) ...................................................... 11

*Pizzuto v. Tewalt*,
No. 1:21-cv-359, 2024 WL 1834473 (D. Idaho Apr. 26, 2024) ...................... 6, 7

*Planned Parenthood of Great Nw. & Haw. Islands v. Wasden*,
410 F. Supp. 3d 1108 (D. Idaho 2019) ............................................ 26

*Preston v. United States*,
923 F.2d 731 (9th Cir. 1991) ........................................................ 9

*Sanders v. Univ. of Idaho*,
No. 3:19-cv-225, 2021 WL 1534969 (D. Idaho Apr. 19, 2021) ...................... 28

*Stockley v. Joyce*,
    963 F.3d 809 (8th Cir. 2020) ............................................................. 10

*Thompson v. Comm'r of Soc. Sec.*,
    425 F. App'x 98 (3d Cir. 2011) .......................................................... 27

*United States v. Holland*,
    519 F.3d 909 (9th Cir. 2008) .......................................................... 9, 23

*United States v. Lovaglia*,
    954 F.2d 811 (2d Cir. 1992) .......................................................... 10, 11

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................. 20

**Federal Statutes**

28 U.S.C. § 455 ..................................................................... 1, 2, 8, 28
42 U.S.C. § 1983 ............................................................................ 5

**State Cases**

*Baker v. State*,
    494 P.3d 1256 (Idaho Ct. App. 2021) ................................................. 21

*Bradbury v. Idaho Jud. Council*,
    233 P.3d 38 (Idaho 2009) ................................................................ 12

*Conley v. Looney*,
    790 P.2d 920 (Idaho Ct. App. 1989) ................................................. 14

*State v. Creech*,
    670 P.2d 463 (Idaho 1983) ............................................................... 2

**State Statutes**

Idaho Code § 18-4504A ..................................................................... 17
Idaho Code § 19-2715 ..................................................................... 3, 4

**Rules**

Fed. R. of App. P. 21 .......................................................................... 1

**Other**

Chief Judge Murguia's Statement re: Judicial Conduct and Disability Complaint
No. 22-90121 (July 8, 2024), available at
https://cdn.ca9.uscourts.gov/datastore/ce9/2024/22-
90121%20News%20Release%20&%20Order%20and%20Certification.pdf.
.............................................................................................................. 29, 30

Idaho Department of Correction, Execution Updates, available at
https://www.idoc.idaho.gov/content/news/execution-updates ................. 6, 18

# DISCLOSURE STATEMENT

Mr. Creech is an individual and not a corporation.

# INTRODUCTION

Under Federal Rule of Appellate Procedure 21 and 28 U.S.C. § 455(a),
Thomas Eugene Creech respectfully petitions for a writ of mandamus directing the
Honorable Amanda K. Brailsford to recuse herself from the proceedings below.

Mr. Creech is a death-row inmate challenging the constitutionality of his
clemency proceedings based on allegations that lawyers working for Ada County
Prosecutor Jan Bennetts presented false evidence at his commutation hearing. *See*
Ex. 15. After Judge Brailsford denied a stay below and Mr. Creech survived the
ensuing failed execution attempt, Mr. Creech learned that only five years ago,
Judge Brailsford recused herself from an appeal because a party had sued Ada
County Prosecutor Jan Bennetts, "who is a personal friend." Ex. 7 at 85. At a
2019 investiture, Ms. Bennetts described Judge Brailsford as "the kind of friend for
whom I would drop everything if she needed me." Ex. 9 at 107–08.[1] In turn,
Judge Brailsford called Ms. Bennetts a "dear friend." *Id.* at 108. Nevertheless,
Judge Brailsford declined to recuse herself from the litigation below, even though
Ms. Bennetts was likewise named there as a defendant. *See* Ex. 1. Judge
Brailsford maintained that her friendship with Ms. Bennetts ended in 1994, which

---

[1] Exhibit 9 is a partial transcription of the investiture ceremony. The video in its
entirety is available at https://www.idahoptv.org/shows/idahoinsession/archive/. It
can be found by selecting the subheading "Idaho Supreme Court" under "Idaho
Supreme Court Proceedings" and then "Download MP4" under "Investiture of
Judge Amanda K. Brailsford, January 2, 2019."

is inconsistent with the quotes above.  Further, Judge Brailsford asserted that she

had shown a willingness to rule against Ms. Bennetts because she had done so in

one case out of more than 600.  *See id.* at 10–11.  And she claimed that Ms.

Bennetts was not personally involved in the relevant decisions here, despite the

fact that Ms. Bennetts attended the clemency hearing in person, that one of the

false statements at issue was on a press release from her office as a whole, and that

she personally traveled to the death house in the hopes of watching Mr. Creech be

put to death in February 2024.  *See id.* at 11.

Because there is plainly a basis by which Judge Brailsford's "impartiality

might reasonably be questioned," § 455(a), and because she failed to refute that

appearance, mandamus relief removing her from the case is appropriate.

## STATEMENT OF THE CASE

As a result of a case brought by the Ada County Prosecuting Attorney's

Office (ACPO), Mr. Creech is on death row in Idaho for killing fellow prisoner

David Jensen with a sock filled with batteries in 1981.  *See State v. Creech*, 670

P.2d 463, 464 (Idaho 1983).  On October 12, 2023, the ACPO obtained a death

warrant for Mr. Creech, scheduling his execution for November.  *See* Ex. 33.[2]  The

next day, Mr. Creech filed a petition for commutation with the Idaho Commission

---

[2] To the extent it is necessary, Mr. Creech respectfully asks that judicial notice be
taken of any court filings from other proceedings referenced here.  *See, e.g.*,
*Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 n.1 (9th Cir. 2020).

of Pardons and Parole (the Commission), asking for his death sentence to be reduced to life in prison without the possibility of release.  *See* Ex. 15 at 156.  On October 18, 2023, the Commission granted a hearing on the commutation petition, which was set for January 19, 2024.  *See id.* at 156–57.[3]

Idaho law provides that "a stay of execution *shall be granted* . . . as part of a commutation proceeding."  Idaho Code § 19-2715(1).  Based on that unequivocal directive, Mr. Creech's counsel asked the ACPO to stipulate to a stay.  *See* Ex. 32 at 405–07.  An ACPO prosecutor wrote a three-character response: "No."  *Id.*  Ms. Bennetts was copied on the email.  *Id.*

Given the ACPO's intransigence, Mr. Creech filed a motion for a stay of execution in state court.  *See* Ex. 32.  The ACPO filed an opposition to the motion. *See* Ex. 31.  At the top of the opposition, the first words on the paper consisted of Ms. Bennetts' name.  *See id.*  Her name appeared on the final page as well.  *See id.* Over the ACPO's objection, the state court granted a stay pending the commutation proceedings.  *See* Ex. 30.

At the commutation hearing, the ACPO was the entity advocating against clemency and in favor of an execution.  *See* Ex. 21 at 264–68.  The ACPO was represented by prosecutor Jill Longhurst.  *See id.*  However, Ms. Longhurst's boss,

---

[3] From this point onward, all dates are references to 2024 unless otherwise indicated.

Jan Bennetts, personally attended the hearing. *See* Ex. 20 at 257–58. At the hearing, Ms. Longhurst emphasized to the Commissioners that Ms. Bennetts "has been the prosecutor of Ada County" for many years and was "here in support of the death penalty today." *Id.*

There were two aspects of the ACPO's presentation to the Commission that Mr. Creech later alleged to be false. First, the ACPO told the Commission that Mr. Creech was responsible for the 1974 murder of Daniel Walker in San Bernardino, California in 1974, and that the case had been closed as a result. *See* Ex. 15 at 158–74. Second, the ACPO displayed a photograph under the pretense that it depicted the murder-weapon sock and that it bore Mr. Creech's name on it. *See id.* at 174–81. Mr. Creech subsequently asserted in the litigation below that he did not kill Mr. Walker, that the case had not been closed, and that the sock in the slide was not the murder weapon. *See id.* at 158–81.

Following the hearing, the ACPO put out a press release in which it stated: "Earlier this week, a cold case was solved in San Bernardino, California when after law enforcement's thorough investigation, they determined Mr. Creech had murdered Daniel A. Walker in October 1974." Ex. 27. The press release also included a quote attributed to Ms. Bennetts, who "extend[ed] [her] appreciation to [her] team" for their work on the matter. *Id.*

4

After the hearing, the Commissioners announced on January 29 that they

had split in a three-three tie on whether to recommend clemency, resulting in a

denial of the petition. *See* Ex. 22. At the ACPO's immediate request, a new death

warrant was signed, scheduling Mr. Creech's execution for February 28. *See* Ex.

29. On February 5, Mr. Creech initiated the lawsuit below, filing a complaint

under 42 U.S.C. § 1983. *See* Ex. 28. Mr. Creech alleged that the ACPO presented

false evidence at the clemency hearing in connection with the Walker case and the

sock. *See id*. As defendants, Mr. Creech named Ms. Bennetts and the Parole

Commission. *See id.* at 355.

On February 8, Mr. Creech filed a motion for a preliminary injunction to

suspend his execution until the litigation was complete. *See* Ex. 26. Judge

Brailsford issued a scheduling order the next day, under which the preliminary-

injunction motion would be fully briefed by February 16. *See* Ex. 25. The parties

filed their submissions accordingly and the motion was ripe for decision on

February 16. *See* Ex. 19. Nonetheless, Judge Brailsford did not issue a decision

until 4:51 PM on Friday, February 23, *see* Ex. 16, leaving two business days for all

Ninth Circuit and Supreme Court proceedings to be completed before the

scheduled execution. The February 23 order denied a preliminary injunction. *See*

*id*. Relying on a Sixth Circuit case, Judge Brailsford reasoned that she could not

consider "the validity of the evidence," i.e., whether or not the ACPO lied at the

hearing.  Ex. 16 at 197.  On appeal, the Ninth Circuit affirmed, *see Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851 (9th Cir. 2024) (per curiam), and the Supreme Court denied a stay and declined to take certiorari review, *see Creech v. Idaho Comm'n of Pardons & Parole*, 144 S. Ct. 1027 (2024).

With all stays denied, Idaho attempted to execute Mr. Creech on February 28.  Ms. Bennetts drove to the prison to watch Mr. Creech be put to death.  *See* Idaho Department of Correction, Execution Updates, https://www.idoc.idaho.gov/content/news/execution-updates.  On IDOC's list of state witnesses, her name appeared first out of the six people mentioned.  *See id.* The execution team was unable to find a suitable vein and officials called off the attempt.  *See Pizzuto v. Tewalt*, No. 1:21-cv-359, 2024 WL 1834473, at *1 (D. Idaho Apr. 26, 2024).  After the botched execution, an amended complaint was filed in the clemency-related litigation below, *see* Ex. 15, and motions to dismiss for failure to state a claim became fully briefed on May 1, *see* Exs. 10, 11.

Earlier, on March 6, Mr. Creech's counsel first became aware of a questionnaire that Judge Brailsford submitted to the United States Senate after she was nominated to a seat on the federal bench.  *See* Ex. 8.  On the questionnaire, Judge Brailsford indicated that she only recused herself once while on the Idaho Court of Appeals, in approximately 2019, and her reason was that a party had sued Ms. Bennetts, "who is a personal friend."  Ex. 7 at 85.  Counsel then began to look

6

for video footage of Judge Brailsford's January 9, 2019 investiture at the court of appeals. *See* Ex. 8. They located the footage on April 25. *See id.* The video shows Ms. Bennetts remarking that Judge Brailsford "is the kind of friend you feel incredibly fortunate to find," someone with whom she "continued to share lunches," and "the kind of friend for whom I would drop everything if she needed me." Ex. 9 at 107–08. Judge Brailsford spoke as well and characterized Ms. Bennetts as her "dear friend." *See id.* at 109.

Based on these discoveries, Mr. Creech filed a motion seeking Judge Brailsford's recusal on May 10. *See* Ex. 5. Both defendants opposed the motion and Mr. Creech submitted a reply in support. *See* Exs. 2–4. On July 8, Judge Brailsford declined to recuse herself. *See* Ex. 1. Mr. Creech now challenges the decision through the present petition for mandamus.

## ARGUMENT

Mr. Creech will first briefly establish that mandamus is an acceptable avenue for contesting the recusal decision below. Then, he will explain why mandamus relief is merited.

### I.   Mandamus is an appropriate vehicle.

This Court has repeatedly reviewed recusal decisions by district judges brought to it through mandamus petitions. *See Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 999 (9th Cir. 2003); *King v. U.S. Dist. Ct.*, 16 F.3d 992, 992–93 (9th

Cir. 1994). In that regard, the Ninth Circuit is in accord with sister courts. *See, e.g.*, *In re Gibson*, 950 F.3d 919, 922 (7th Cir. 2019) ("We have long recognized that a petition for writ of mandamus is an appropriate method to seek recusal of a district judge under 28 U.S.C. § 455(a)."); *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 (3d Cir. 1993) ("Mandamus is a proper means for . . . review [of] a district court judge's refusal to recuse from a case pursuant to 28 U.S.C. § 455(a), where the judge's impartiality might reasonably be questioned.").[4] The reason that mandamus fits recusal issues "during the pendency of a case" is that "ordinary appellate review following a final judgment is insufficient to remove the insidious taint of judicial bias." *In re Al-Nashiri*, 921 F.3d 224, 233 (D.C. Cir. 2019). Additionally, a litigant challenging a recusal ruling does not have to wait for an appeal because then "the record" will potentially be "made up by a judge we know to be prejudiced." *Gladstein v. McLaughlin*, 230 F.2d 762, 763–64 (9th Cir. 1955). Mandamus consideration is therefore proper here.

## II.   Mandamus relief is warranted.

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which h[er] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Whether a judge's impartiality might reasonably be questioned is "to be evaluated on an *objective* basis, so that what matters is not

---

[4] Unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510

U.S. 540, 548 (1994) (emphasis in original). Thus, the question is "whether a

reasonable person with knowledge of all the facts would conclude that the judge's

impartiality might reasonably be questioned." *Preston v. United States*, 923 F.2d

731, 734 (9th Cir. 1991). Analysis of this question "is necessarily fact-driven and

may turn on subtleties in the particular case." *United States v. Holland*, 519 F.3d

909, 913 (9th Cir. 2008). "If it is a close case, the balance tips in favor of recusal."

*Id.* at 912.

　　Applying these principles to the appellate context in particular, a petition for

mandamus attacking a recusal order is meritorious when the judge harbors "bias"

that "stems from extrajudicial sources." *Cordoza*, 320 F.3d at 999. The question

is whether it is "manifestly clear that a reasonable observer would question the

Judge's impartiality on the pending issue." *In re IBM*, 45 F.3d 641, 644 (2d Cir.

1995). Mr. Creech can satisfy that test.

### A. The friendship creates an appearance of partiality.

　　To recapitulate the key facts from above, at the 2019 investiture, Ms.

Bennetts remarked that Judge Brailsford "is the kind of friend you feel incredibly

fortunate to find," someone with whom she "continued to share lunches," and "the

kind of friend for whom I would drop everything if she needed me." Ex. 9 at 107–

08. Judge Brailsford returned the compliment, characterizing Ms. Bennetts as her

"dear friend." *Id.* at 109. That kind of close relationship triggers reservations in the reasonable observer as to whether Judge Brailsford would be neutral in determining whether Ms. Bennetts and her office engaged in the serious acts of dishonesty alleged by the complaint. *See Moran v. Clarke*, 296 F.3d 638, 649 (8th Cir. 2002) (en banc) ("The image of one sitting in judgment over a friend's affairs would likely cause the average person in the street to pause."), *abrogated on other grounds as recognized by Stockley v. Joyce*, 963 F.3d 809, 821 (8th Cir. 2020). Such a friendship is also a "bias" that "stems from extrajudicial sources," *Cordoza*, 320 F.3d at 999, since it relates to the personal life of the judge.

Judge Brailsford's main response to the forgoing reasoning is to claim that the friendship only lasted while she and Ms. Bennetts clerked together in 1993 and 1994, after which they "lost touch." Ex. 1 at 7–8. But that account is inconsistent with the record. It was in 2023, just last year, that Judge Brailsford told the U.S. Senate that Ms. Bennetts "*is* a personal friend." Ex. 7 at 85. The use of the present tense does not reflect a friendship that ended thirty years earlier. It was also in 2019 that Ms. Bennetts stated at the investiture that the two "continued to share lunches" and that Judge Brailsford is "the kind of friend for whom I would drop everything if she needed me." Ex. 9 at 107–08. The documented timeline in this case weakens the recusal order's reliance on *United States v. Lovaglia*, 954 F.2d 811 (2d Cir. 1992), *see* Ex. 1 at 8, where a judge and a lawyer were once friends

but where the two "drifted away" from one another seven years earlier, *see*

*Lovaglia*, 954 F.2d at 814.  Unlike *Lovaglia*, there is evidence from the statements

and actions of both Judge Brailsford and Ms. Bennetts that the two remained

friends up until last year at the latest.

Notably, while listing various types of occasions at which the two either did

or did not see each other, the recusal order omits any reference to lunches, even

though those were the events that Ms. Bennetts specifically recounted at the

investiture.  *See* Ex. 1 at 8.  At any rate, the statements about the friendship made

at the investiture were statements about the present—and the future—not about a

moment in time three decades earlier.  At best, the recusal order's historical

revisionism reflects an inability to understand that "outside observers are less

inclined to credit judges' impartiality and mental discipline than the judiciary itself

will be." *In re Nettles*, 394 F.3d 1001, 1002 (7th Cir. 2005).

**B. The prior recusal creates an appearance of partiality.**

Importantly, Judge Brailsford has already recognized that her friendship

with Ms. Bennetts requires recusal in cases where the latter's conduct is personally

implicated.  As noted above, Judge Brailsford previously recused herself because

of her relationship with Ms. Bennetts when the latter was personally sued by a

litigant because, if she had remained on the appeal, her "impartiality might

reasonably be questioned." Ex. 7 at 85.  In taking that course of action, Judge

Brailsford was presumably following Idaho law regarding recusals. *See Bradbury v. Idaho Jud. Council*, 233 P.3d 38, 44 (Idaho 2009) (clarifying that the standard for recusal in Idaho state courts is whether "the judge's impartiality might reasonably be questioned"). The state-law test is for all intents and purposes identical to the federal one. *See id.* at 45 (characterizing federal recusal cases as "instructive" while citing approvingly from them). In short, if there was a potential appearance of partiality in the prior case, there is one here as well.

Pushing back against the preceding argument, Judge Brailsford reasoned that "[p]rior recusals, without more, do not objectively demonstrate an appearance of partiality." Ex. 1 at 10 (quoting *Diversified Numismatics, Inc. v. City of Orlando, Fla.*, 949 F.2d 382, 385 (11th Cir. 1991)). As an initial matter, there *is* more here—explicit statements about the closeness of the bonds by both of the individuals involved. The recusal order also misconstrues *Numismatics*. There, the judge had previously disqualified himself "because of his feeling that he might be biased against counsel due to counsel's unprofessional conduct." *Numismatics*, 949 F.2d at 385. In affirming the judge's refusal to recuse, the Eleventh Circuit relied on the idea that "[t]empers do cool, and anger does dissipate." *Id.* Contrastingly, the only indication of any change in the social relationship between Judge Brailsford and Ms. Bennetts is the former's insistence that the relationship ended in 1994—a narrative flatly contradicted by the record. Their relationship

12

had not "dissipate[d]" by 2019, when it led to a recusal, and there is no evidence

that anything changed from then to the present.

What is more, Judge Brailsford's basis for distinguishing her prior recusal

does not ease the partiality concerns. The recusal order minimizes the prior

disqualification on the ground that it was rooted in "recent interactions with Ms.

Bennetts in 2019 and because the case specifically named her personally in her

individual capacity." Ex. 1 at 9–10. For one thing, that is at odds with the Senate

questionnaire, which did not say the prior recusal was because of recent

interactions—it said the disqualification was because Ms. Bennetts "is a personal

friend." Ex. 7 at 85.

And for another, the order denying Mr. Creech's recusal motion itself raises

questions about the accuracy of its timeline. The order asserts that Judge

Brailsford's "personal interactions with" Ms. Bennetts "since 1994 have been very

limited and professional rather than social in nature." Ex. 1 at 8. If that is correct,

though, why would recusal have been merited in 2019? In other words, "recent

interactions" with someone that are of a "very limited and professional" nature are

not bases for recusal. Presumably, there was—in 2019—a close enough *friendship*

such that recusal was necessary. That is not a friendship that ended in 1994.

The recusal order's other basis for attempting to distinguish the prior

disqualification decision was that, in the earlier appeal, "the case specifically

named [Ms. Bennetts] personally in her individual capacity." *Id.* at 9–10.  That
somewhat opaque phrase does not remove the appearance of partiality.  To start, it
is not clear what the district court meant by it.  Mr. Creech has also "specifically
named" Ms. Bennetts "personally."  *See* Ex. 28 at 355.

And while it is true that Mr. Creech named Ms. Bennetts in her professional
capacity, it is hard to fathom what difference that makes.  In Idaho, state officers
can be sued in their individual capacities for claims arising from their employment.
*See Conley v. Looney*, 790 P.2d 920, 922 (Idaho Ct. App. 1989).  That is likely
what occurred in the prior recusal, since the individual involved was "convicted of
a crime in Ada County" and "filed a civil action against public officials including
the Ada County Prosecutor."  Ex. 7 at 85.  In other words, the individual filed a
lawsuit in which he named Ms. Bennetts based on actions that she took as Ada
County Prosecutor.  That is precisely what Mr. Creech has done.  Finally, if the
implication is that Ms. Bennetts would have been personally liable in the prior civil
case, that too does not make the matter more serious—she could have been liable
for a small sum, and in any event the commission of serious ethical breaches in a
capital proceeding is hardly trivial.  At a minimum, considering that neither Judge
Brailsford nor Ms. Bennetts offers any illumination of any of these possibilities,
the reasonable person would suspect that no real distinction exists.  *See In re Al-
Nashiri*, 921 F.3d at 237 (characterizing the average observer for recusal purposes

as someone "all too willing to indulge suspicions and doubts concerning the integrity of judges").

It is likewise telling that the ACPO did not shed any light below on the nature of the lawsuit that led to the recusal, as it presumably could easily have done since it filed its opposition on behalf of Ms. Bennetts herself.  *See* Ex. 4.  Ostensibly, ACPO and Ms. Bennetts either know or could easily determine (unlike Mr. Creech[5]) why she was sued in the earlier case.  It is inappropriate for the district court to draw inferences against Mr. Creech from an information gap caused by the ACPO's own lack of transparency.  If anything, the ACPO's silence dictates the opposite inference—that Ms. Bennetts was sued for actions that she took while discharging her duties as Ada County Prosecutor, just as she was here.  And no matter what those actions were, it is literally impossible that they resulted in a man being sent to the execution chamber, as alleged here, so the case for recusal is stronger in Mr. Creech's case regardless.

### C. Ms. Bennetts is implicated by the allegations.

In an effort to minimize the friendship at the heart of the disqualification motion, the recusal order downplays the connection between Ms. Bennetts and the deceptive acts alleged in the complaint.  *See* Ex. 1 at 11 ("[T]he record . . . did not

---

[5] Mr. Creech's counsel have without success tried to locate the court of appeals case at issue.

reflect Ms. Bennetts' involvement in any unethical decisions."). There are
multiple flaws in that approach.

One is that it overlooks the reality that there could be an appearance of
partiality even if Ms. Bennetts was not personally involved in *all* of the actions
relating to the presentation of false evidence. For starters, a reasonable observer
would assume that Ms. Bennetts was in fact involved in at least one such action.
After the commutation hearing, the ACPO issued a press release in which it
reiterated one of the two false claims underlying the litigation below. Specifically,
in the press release, the ACPO stated that the Daniel Walker case had been
"solved" and it closed with a quote attributed to Ms. Bennetts herself. Ex. 27. The
amended complaint expressly challenges the press release as false. *See* Ex. 15 at
161. It would be bizarre if Ms. Bennetts did not approve a press release from the
office she leads about a high-profile case in which her own name appeared. The
press release was presented to the public as coming from the ACPO as a whole, not
from any individual deputy prosecutor. *See* Ex. 27. No doubt the public would
have understood the press release as essentially a statement by Ms. Bennetts, who
is the face of the office. The deception at the heart of Mr. Creech's claim is
therefore tied in a straightforward fashion to Ms. Bennetts.

It is concerning, for disqualification purposes, that judicial review would
have to question the truthfulness of the press release. For a finding of dishonesty

would be incompatible with the praise Judge Brailsford directed at Ms. Bennetts at her investiture. One of the very first things Judge Brailsford did after donning her robe and taking her official seat on the bench was to commend Ms. Bennetts' scrupulousness, telling the audience that she had won the Idaho State Bar Professionalism Award, which was "most apropos of Jan[.]". Ex. 9 at 109. Judge Brailsford further elaborated that Ms. Bennetts was "a consummate professional every day, all day, for her entire career." *Id.* The factual basis of Mr. Creech's lawsuit directly contradicts Judge Brailsford's statements regarding Ms. Bennetts. That kind of tension spurs reservations in a reasonable onlooker's mind about whether a judge is able "to hold the balance nice, clear and true between the" litigants. *Echavarria v. Filson*, 896 F.3d 1118, 1131 (9th Cir. 2018).

Furthermore, even apart from the specific unscrupulous acts at issue, Ms. Bennetts *was* clearly invested in a personal fashion in seeing that Mr. Creech was denied clemency and executed. The ACPO—the office run by Ms. Bennetts—is the entity that pursued and obtained the death sentence for Mr. Creech. *See* Idaho Code § 18-4504A (providing that a "sentence of death shall not be imposed unless the prosecuting attorney file[s a] written notice of intent to seek the death penalty"). It is also the entity that opposed a stay required by state law in a filing bearing Ms. Bennetts' name. *See supra* at 3. And it is the entity that went to a

17

judge twice to ask him to sign a death warrant scheduling Mr. Creech's execution.
*See supra* at 2, 5.

In the clemency proceedings, the ACPO was the office advocating for Mr.
Creech's execution.  When it succeeded, an inmate convicted by the ACPO was for
the first time in thirty years taken to the execution chamber.   *See Wells by and
through Kehne v. Arave*, 18 F.3d 656 (9th Cir. 1994) (per curiam).  Ms. Bennetts
appeared personally at the commutation hearing, where she was recognized by the
handling prosecutor before the Commission as a significant source of support for
the office's position.  *See supra* at 4.  Once the ACPO accomplished its goal and
prevented clemency from being awarded, Ms. Bennetts herself traveled to the
prison to be one of a very small number of officials who could watch Mr. Creech
be killed in person.  *See* Idaho Department of Correction, Execution Updates,
https://www.idoc.idaho.gov/content/news/execution-updates.   Simply put, there is
no question that Ms. Bennetts signaled her strong and personal commitment to the
project of denying Mr. Creech clemency and having him put to death.  A decision
in Mr. Creech's favor would mean that Ms. Bennetts' office was egregiously
malfeasant in pursuing those goals and that an execution would likely be at least
deferred.  An objective onlooker would surely wonder about a judge's willingness
to obstruct her "dear friend" from accomplishing her mission while saddling her
and her office with damaging reputational costs.

18

Another defect in the recusal order's handling of this issue is that it
misunderstands the significance of the procedural posture of the case at bar.  The
recusal order posits that "[w]hile Mr. Creech accuses Ms. Bennetts personally of
unethical behavior in his recusal motion, those accusations are unsupported
conjecture." Ex. 1 at 11.  If anything, that cuts in favor of recusal.  The defendants
have both filed motions to dismiss Mr. Creech's amended complaint for failure to
state a claim.  *See* Exs. 12–13.  If the motions are denied, the case would head into
discovery as a matter of course.  *See, e.g.*, *Carter v. DeKalb Cnty.*, 521 F. App'x
725, 728 (11th Cir. 2013) (per curiam) ("[D]iscovery follows the filing of a well-
pleaded complaint." (emphasis omitted)).  Even if there is no ultimate victory for
Mr. Creech on the merits, the reasonable outsider would question whether a judge
might be motivated to shield a close friend from the possibility of discovery
uncovering misconduct by her or her office.

By way of one example, when Mr. Creech sought expedited discovery in
connection with preliminary-injunction litigation, he requested leave to pose an
interrogatory asking who was responsible for the misleading language in the
Walker press release discussed above. *See* Ex. 24 at 310.  A likely answer would
be Ms. Bennetts.  Another area that would be ripe for discovery concerns
communications between the ACPO and the San Bernardino District Attorney
(SBDA).  It is undersigned counsel's position that the ACPO and the SBDA have

19

worked in concert so that Mr. Creech would be falsely accused at the commutation

hearing of murdering Mr. Walker without either office having to defend the

allegations in a court of law. *See, e.g.*, Ex. 18. Undersigned counsel have

supported their theory by pointing to the fact that the SBDA, Jason Anderson, has

announced that he will not charge Mr. Creech while simultaneously insisting

without evidence that he has proof of his guilt beyond a reasonable doubt. *See id.*

If permitted, Mr. Creech would pursue discovery into communications between the

ACPO and the SBDA.  It is foreseeable that such messages would involve Ms.

Bennetts, since she is Mr. Anderson's counterpart in Ada County.

Simply stated, a reasonable person could certainly feel that a judge would be

inclined to shield a close friend from the prospect of such an investigation.  There

is more than enough of a factual basis for a reasonable person to suspect that Ms.

Bennetts was personally involved in decisions affecting a high-profile case that she

took a direct interest in.  That is all that Mr. Creech must show to justify recusal.

*See United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001)

("Appearance may be all there is, but that is enough.").  It is unpersuasive for the

recusal order to suggest that disqualification is improper on the ground that all of

the facts are not yet in, when the very decision about how much will become

known rests in the hands of a judge who has a vested interest in how the question

will be answered.

**D. Judge Brailsford's *Baker* opinion is irrelevant.**

The recusal order contends that Judge Brailsford has shown her willingness

to rule against the ACPO, thus dispelling any appearance of partiality. *See* Ex. 1 at

10. To prove as much, the order cites a single decision: *Baker v. State*, 494 P.3d

1256 (Idaho Ct. App. 2021). *See* Ex. 1 at 10.[6] Preliminarily, Mr. Creech

calculated that Judge Brailsford participated in approximately 618 cases involving

the ACPO—a number the recusal order does not dispute. *See* Ex. 2 at 20. One

adverse decision out of 618 (that is, .16%) is not a fraction that leaps to mind as a

paragon of balance.

What is more, while the recusal order calls *Baker* a case "raising questions

about the ACPO's ethical behavior," Ex. 1 at 10, there is no language about ethics

in the opinion. To the contrary, *Baker* is written in an extremely mild manner. *See*

494 P.3d at 1278 ("The prosecutor's strategic decision to present facts related to

these arguments and to make them during closing argument may have heightened

the prosecution's obligation to investigate their veracity."). That is quite a

---

[6] In addition to *Baker*, the defendants below cited a number of other cases for the proposition that Judge Brailsford had demonstrated her ability to impartially resolve issues involving the ACPO while on the court of appeals. *See* Ex. 4 at 39–40; Ex. 3 at 31–32. Because the recusal order only relied on one of the cases—*Baker*—Mr. Creech focuses on that decision as well. Insofar as the Court is interested in the defendants' other citations, Mr. Creech stresses that Ms. Bennetts was not a party to any of them, that her name does not appear in any of them, and that none of them opine on the ACPO's morality. Setting all that aside, even if the cases did support the defendants' stance, they would represent roughly .6% of the decisions that Judge Brailsford joined regarding the ACPO, which is hardly a ringing confirmation of impartiality. *See* Ex. 2 at 20.

different situation than one in which the ACPO has been accused of telling blatant lies at a capital clemency hearing.

Relatedly, there is nothing about the *Baker* case that suggests any personal involvement by Ms. Bennetts whatsoever, as her name is absent from the opinion. Even the association with the ACPO generally is tenuous. The ACPO was not a party to the case. Rather, it was the State of Idaho that served as the plaintiff below and the respondent on appeal. In the appeal, which is the only litigation that Judge Brailsford was concerned with, the Attorney General represented the State and not the ACPO. None of those features are true of the present case, where Ms. Bennetts herself is a named defendant based on actions taken under her direct supervision and with her close involvement. A ruling in Mr. Creech's favor below would literally be a ruling against Ms. Bennetts. In *Baker*, the opinion was at most a ruling against the State of Idaho, which presents a far different dynamic.

In summary, a reasonable commentator would not be placated by the fact that Judge Brailsford was capable of issuing a single opinion out of hundreds of opportunities that was adverse to the ACPO in a case with no personal involvement by Ms. Bennetts.

### E. The unique posture of the case favors recusal.

Analysis of a recusal issue "is necessarily fact-driven and may turn on subtleties in the particular case." *Holland*, 519 F.3d at 913. In the present case, the unique status of the litigation weighs heavily in favor of recusal.

Perhaps most significantly, this is a capital case in which one of Mr. Creech's requested remedies is that an execution be prohibited by the Court. *See* Ex. 15 at 185. The life-or-death nature of the proceedings has two important implications here. First, "[w]hen a defendant's life is at stake, the [Supreme] Court has been particularly sensitive to insure that every safeguard is observed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality op.).

Surprisingly, the district court saw no significance to the capital nature of the proceedings. *See* Ex. 1 at 11 ("Contrary to these arguments, the applicable standards and analysis remain the same despite that Mr. Creech is subject to the death penalty."). One would have thought it to be uncontroversial that, when a man's life is at stake, it is all the more important that "justice must satisfy the appearance of justice." *In re Murchison*, 349 U.S. 133, 136 (1955). Apart from *Gregg*, the Supreme Court and the Ninth Circuit have repeatedly reiterated over many years of unbroken precedent that capital cases do carry greater obligations for judicial rigor and care. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 352–53 (2002) (Scalia, J., dissenting) (critiquing the Court's "death-is-different

23

jurisprudence" and listing ten cases falling in that category); *California v. Ramos*, 463 U.S. 992, 998–99 (1983) ("The Court . . . has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."); *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) ("[W]e do not denigrate the reflection that death is different from other penalties; it most assuredly is."). Based on that long tradition, the D.C. Circuit has recognized the obvious: "In no proceeding is the need for an impartial judge more acute than one that may end in death." *In re Al-Nashiri*, 921 F.3d at 239. In fact, "the gravity of [that] penalty . . . make[s] the need for an unimpeachable adjudicator all the more important." *Id.* at 241.

The district court's indifference to the capital aspect of the case, standing alone, raises partiality concerns. Under the district court's view, the matter would apparently be treated the same if Ms. Bennetts had prosecuted Mr. Creech for shoplifting rather than capital homicide and if Judge Brailsford were weighing a $100 civil judgment rather than an execution. That is not the appearance of justice.

Second, the centrality of an execution to the proceedings makes the social entanglement at issue more problematic. If Mr. Creech's allegations are correct, it would mean that Ms. Bennetts' office sent a man to his attempted execution through deceit. A reasonable person would surely question a judge's willingness to convey such a message to the world about a "dear friend." The dynamic is

24

further complicated by the fact that Judge Brailsford has already denied a stay of execution in connection with the case at bar. *See* Ex. 16. A ruling in Mr. Creech's favor now would signify that Judge Brailsford in February approved of an execution secured by a fraud perpetrated on behalf of a good friend. That is not a scenario conducive to the appearance of complete impartiality.

In a similar vein, the matter of what legal framework the district court brings to bear on Mr. Creech's claim raises impartiality concerns. During the preliminary injunction dispute, ACPO attorneys—i.e., Ms. Bennetts' subordinates—argued strenuously that precedent does not allow for any consideration of whether prosecutorial assertions at a clemency hearing are true or false. *See* Ex. 23 at 287–90. Judge Brailsford agreed with the ACPO and concluded the law permits no judicial inquiry into "the validity of the evidence." Ex. 17 at 210. The upshot of that determination is that there was no investigation by the district court into whether Ms. Bennetts and her staff propagated falsehoods about the commutation evidence. If she remains on the case, Judge Brailsford herself will have to reassess that interpretation of the law while she adjudicates the motions to dismiss the amended complaint. *See* Ex. 14 at 147. The Court's adjudication of the question will resolve, as it did before, whether Ms. Bennetts and her employees are subjected to a judicial evaluation of their honesty, or whether they are spared that

experience.  It might well cross the mind of a reasonable spectator that a judge would be more inclined to insulate a close friend from such an ordeal.

To that end, Mr. Creech is not suggesting that any case in which Ms. Bennetts' office was previously involved necessitates an automatic recusal by Judge Brailsford.  There are doubtlessly many habeas cases, to name one prime category, in which Ms. Bennetts or her underlings represented the State at trial, and in which few if any of the apprehensions outlined above would be present.  *See, e.g.*, *Hawkins v. Christensen*, No. 1:13-cv-321, 2022 WL 60667, at *2 (D. Idaho Jan. 6, 2022) (mentioning that Ms. Bennetts served as one of the trial prosecutors in a habeas case).  Nonetheless, that does not weaken the case for recusal under the extraordinary facts now before the Court.

To the extent the Court deems it germane, from a practical standpoint a recusal order here would have limited ramifications for other cases.  During the ten years in which Ms. Bennetts has been in office, she has only been named as a defendant in a handful of federal actions.  In most of them, she has been sued only because the cause of action related to criminal law enforcement in Ada County in some way, and Ms. Bennetts was accordingly a relevant actor as a technical matter. *See, e.g.*, *Planned Parenthood of Great Nw. & Haw. Islands v. Wasden*, 410 F. Supp. 3d 1108 (D. Idaho 2019).  Mr. Creech's searches on Westlaw did not reveal a single other federal case remotely comparable to the present one, where Ms.

Bennetts has been named in a lawsuit involving serious accusations of false evidence presented by her office in a matter that elicited her personal attention. Far from disrupting the district court's general business, an order of disqualification would only serve to guarantee the public's confidence in the federal judiciary and its determination to be perceived as beyond ethical reproach.

Another concerning aspect of the case is Ms. Bennetts' role in the recusal litigation. It is common for opposing counsel to take no position on recusal motions, especially when they represent government agencies. *See, e.g.*, *Thompson v. Comm'r of Soc. Sec.*, 425 F. App'x 98, 100 n.2 (3d Cir. 2011). That is partly because government lawyers are in theory pursuing a just outcome, rather than simply a victory. *See Berger v. United States*, 295 U.S. 78, 99 (1935) (declaring that prosecutors are "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done").

Ms. Bennetts took a different approach below. In a detailed filing that bore her name at the top and on the final page, Ms. Bennetts' office argued strenuously against recusal. *See* Ex. 4. The district court below thus confronted a situation in which the judge's "dear friend" was advocating for her to remain on a capital case in which she is a defendant. It is unclear what possible interest Ms. Bennetts could

27

have in that outcome other than the partiality of the decision-maker, which

reinforces the appearance of injustice permeating the proceedings below.

One final aspect of the case that demands mention is the district court's

failure to disclose the potential conflict in a timely fashion. There is a mechanism

for potential recusal grounds to be revealed to parties so that they can, if they wish,

consent or challenge the judge's participation. *See* 28 U.S.C. § 455(e); *see also*

*Sanders v. Univ. of Idaho*, No. 3:19-cv-225, 2021 WL 1534969, at *4 (D. Idaho

Apr. 19, 2021) (explaining another Idaho federal district court judge's practice of

issuing a "disclosure to counsel at the earliest possible date" whenever the judge

"ha[s] a connection with a party or an attorney that . . . might cause some

discomfort for the parties in the case" and inviting counsel to request recusal). As

referenced earlier, the case below was initiated after Mr. Creech had been given a

death warrant setting his execution for a few weeks later. *See supra* at 5. Judge

Brailsford then denied a preliminary injunction in the case, leading directly to an

execution attempt on Mr. Creech. *See supra* at 6. Throughout the several weeks in

which Mr. Creech was litigating the question of whether he would live or die in

front of Judge Brailsford, he had no idea of the association between her and a

named defendant, Ms. Bennetts.

Even accepting as true Judge Brailsford's later retelling of her friendship,

that narrative was not in the public sphere at the time Mr. Creech went to the

execution chamber.  What was in the public sphere was that Judge Brailsford had

over the course of some 1,500 cases that she participated in while at the court of

appeals recused herself from a single one, and for the sole reason that Ms. Bennetts

"is a personal friend." Ex. 7 at 85.  If Judge Brailsford genuinely believed that her

ties to Ms. Bennetts were unproblematic, there would have been no downside to a

notification advising the parties of the relationship and giving them a chance to

weigh in on it, which could—if appropriate—have been followed by a denial of a

recusal motion.  But the parties were not given that chance, because the

information was not revealed.  Surely any judicial officer would appreciate that a

death-row inmate litigating his execution has an interest in at least learning that the

judge had previously recused herself because of a personal friendship with the

named defendant who allegedly oversaw the presentation of false evidence

underlying the case.  The absence of that disclosure raises a troubling worry that

the information was withheld not because it fell short of the recusal standard, but

out of a hope that the relationship would remain unknown to Mr. Creech's counsel.

That is yet another reason why there is not an appearance of justice here, and why

mandamus is necessary.

## CONCLUSION

This Court recently reaffirmed its commitment to "hold its federal judges to

the highest standards of integrity and impartiality."  Chief Judge Murguia's

Statement re: Judicial Conduct and Disability Complaint No. 22-90121 (July 8, 2024), available at https://cdn.ca9.uscourts.gov/datastore/ce9/2024/22-90121%20News%20Release%20&%20Order%20and%20Certification.pdf.

Respectfully, the highest standards of integrity and impartiality are not met when a district judge remains on a capital case where a named defendant accused of misconduct is a "dear friend" and when the relationship led to a recusal only a few years earlier.  Mr. Creech respectfully asks the Court to issue a writ of mandamus directing Judge Brailsford to recuse herself from the proceedings below.

### STATEMENT OF RELATED CASES

Undersigned counsel is not aware of any related cases pending in this Court.

Respectfully submitted this 19th day of July 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz
*Attorney for Plaintiff/Petitioner*
THOMAS EUGENE CREECH

30

# CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.  Pursuant to Ninth Circuit Rules 21-2 and 32-3, I certify that the foregoing Petition for Writ of Mandamus is proportionately spaces, has a typeface of 14 points or more, and does not exceed 30 pages.

DATED this 19th day of July 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz

*Attorney for Plaintiff/Petitioner*
THOMAS EUGENE CREECH

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of July 2024, I electronically filed the

foregoing Appellant's Petition for Writ of Mandamus and Exhibits with the Clerk

of the Court for the United States Court of Appeals for the Ninth Circuit by using

the appellate ACMS/ECF system.

I further hereby certify that on the same day, I caused to be served a true and

correct copy of the foregoing document by the method indicated below, postage

prepaid where applicable, addressed to:

Hon. Amanda Brailsford                  _X_   U.S. Mail
U.S. District Court
550 W. Fort Street, Room 400
Boise, ID 83724

Dayton P. Reed                       _X_   Electronic Mail
Dayton.Reed@ag.idaho.gov
Heather McCarthy
hmccarthy@adacounty.id.gov
Sherry A. Morgan
smorgan@adacounty.id.gov
*Counsel for Real Party in Interest Bennetts*

Karin Magnelli                       _X_   Electronic Mail
kmagnelli@idoc.idaho.gov
Rebecca Strauss
rstrauss@idoc.idaho.gov
*Counsel for Real Party in Interest Parole Commission*

                                    */s/ Julie Hill*
                                    Julie Hill