Nicole Owens
EXECUTIVE DIRECTOR
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
Assistant Federal Defenders
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
        Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | **CASE NO. 1:24-cv-00066-GMS** |
| ) | |
| Plaintiff, ) | |
| v. ) | **CONSOLIDATED REPLY IN** |
| ) | **SUPPORT OF RENEWED MOTION** |
| **IDAHO COMMISSION OF PARDONS** ) | **FOR PRELIMINARY INJUNCTION** |
| **AND PAROLE; JAN M. BENNETTS,** Ada ) | **[DKT. 53], MOTION FOR** |
| County Prosecuting Attorney, in her official ) | **ADMINISTRATIVE STAY OF** |
| capacity, ) | **EXECUTION [DKT. 54], AND** |
| ) | **RENEWED MOTION TO** |
| Defendants. ) | **EXPEDITE DISCOVERY [DKT. 55]** |
| ) | |
| ) | |
| ) | |

The death warrant scheduling Mr. Creech's execution for November 13 was signed at the request of Defendant Jan Bennetts' office. *See* Ex. 1. Defendant Bennetts is also the main reason that this case went nowhere for the last eight months. *See generally* Dkt. 59 (removing the prior judge because of her friendship with Defendant Bennetts). It would offend society's most basic sense of justice for the Court to allow Defendant Bennetts to now put to death a man alleging serious misconduct against her own office. A preliminary injunction or a stay is needed.

Because the Court called for a consolidated reply, Mr. Creech will first address his motion for a preliminary injunction. Then, he will turn to his request for expedited discovery.

Finally, he will close with his motion for an administrative stay of execution. Given how interrelated the issues are, Mr. Creech incorporates every section into every other section.

## I.    A preliminary injunction is merited.

Turning to the preliminary injunction, Mr. Creech will begin with the Commission's misguided mootness theory. After that, he will take up the impact of the prior rulings, followed by the preliminary-injunction factors.

### A.    Mr. Creech's claim is justiciable.

Working from a fundamental misunderstanding of what the doctrine means, the Commission contends that Mr. Creech's cause of action is moot. *See* Dkt. 68 at 3–7. The Commission's theory of mootness is essentially that because it—a defendant in this case— disagrees with Mr. Creech's allegations, he has no live controversy. *See id.* at 4–5. Unsurprisingly, the Commission cites no authority for the bizarre notion that a defendant can render a claim moot by deeming it unpersuasive. That would be an odd way for the courts to handle mootness in a system that is defined by its adversarial nature.

If one examines the assumptions underlying the Commission's perspective on mootness, they hold up no better. The Commission's analysis of mootness is focused on its ability to grant or deny commutation hearings. *See id.* at 6. Because the Commission has declined to hold a new hearing, the Attorney General reasons, Mr. "Creech's claims for prospective relief are moot." *Id.*[1] The Commission's mistake is to forget that it is not the relevant decision-making authority *in this litigation*. That, of course, is the Court. When a federal court finds that an administrative proceeding violated due process, it often remands for a new hearing. *See, e.g.*, *Saidane v. INS*,

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

129 F.3d 1063, 1066, 1069 (9th Cir. 1997) (concluding that the government denied an individual "a fundamentally fair hearing" in immigration proceedings and therefore remanding "for a hearing that comports with due process"). Such an order is one of the primary remedies Mr. Creech is seeking. *See* Dkt. 30 at 33. "It is the federal courts that are the final arbiters of federal constitutional rights." *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009). If the federal courts ultimately agree with Mr. Creech that his due process rights were violated, they unquestionably have the power to order the Commission to hold a new hearing. The Commission does not have the unilateral power to decide for itself whether it violated the Constitution. A case is not moot when the court "retains the ability to fashion some form of meaningful relief between the parties." *Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 1000 (9th Cir. 2004). The Court here has the ability in the shape of an order for a new clemency hearing.

Notwithstanding the Commission's sense of its own importance, none of the above calculus is affected by its recent denial of a second commutation hearing. *See* Dkt. 68 at 4. The denial of a second hearing does not somehow insulate the earlier proceedings from constitutional claims. Indeed, it is hard to understand how it possibly could. If one of Mr. Creech's requested remedies is a new hearing, and one was just denied, how could that possibly make his claim moot? He has *still* not been granted the untainted hearing that is required under his constitutional theory. If the Commission had *granted* a second hearing, it might be another story. Then, the Commission might plausibly maintain that it had cured any constitutional violation by considering anew a commutation without the false evidence. But the Commission denied a hearing and cured nothing. In the same vein, it is neither here nor there that the Commission has broad discretion to grant hearings when it sees fit. *See id.* Mr. Creech is not here attacking the

Commission's decision to deny a hearing. He is attacking the presentation of false evidence at a hearing the Commission *granted*.

That key fact distinguishes the case from *Bernhardt v. Cnty. of LA*, 279 F.3d 862 (9th Cir. 2002), on which the Commission relies. Of that case, the Commission writes that "[w]here the activities sought to be enjoined already have occurred, and the appellate courts cannot undo what has already been done, the action is moot and must be dismissed." Dkt. 68 at 6. That was true of *Bernhardt*, but it is not the case here. In *Bernhardt*, the plaintiff challenged Los Angeles County's practices with respect to settling civil rights cases, which she claimed prevented her from getting counsel. *See* 279 F.3d at 865. She pointed to an ongoing appeal in which she was unsuccessfully seeking an attorney. *See id.* Her prospective argument was that "she would be able to obtain a lawyer in the appeal of the underlying action if she obtained injunctive or declaratory relief in the instant action." *Id.* at 866. But the appeal in the underlying proceeding was dismissed while the challenge to the settlement policies was still pending. *See id.* Thus, her prospective claims became moot. *See id.* at 871.

The difference between Mr. Creech and Ms. Bernhardt is that his claim has never been premised on an *ongoing* commutation proceeding. He filed his original petition after the Commission denied his petition. *See* Dkt. 1 at 18. There was nothing pending in the Commission when he brought his case. His claim has always been that the Commission should give him a fair hearing without the influence of false evidence. *See id.* at 26. That remedy has never been provided and he continues to seek it today. His case is the opposite of *Bernhardt* and that is precisely why it is not moot.

Having failed to arrogate to itself the power to render claims against it moot, the Commission next turns to the Governor. Specifically, the Attorney General relies on the fact that

Consolidated Reply in Support of Emergency Motions - 4

the Governor is the one who ultimately decides on a commutation petition if he receives a favorable recommendation from the Commission. *See* Dkt. 68 at 5. In this case, because the Commission split three-three after an unexplained recusal, the Governor never received a recommendation and was never in a position to make a decision one way or another. *See* Dkt. 4-1 at 26–28; Dkt. 15 at 7. Nevertheless, the Governor took it upon himself to announce that he had "zero intention of taking any action that would halt or delay" the previously scheduled execution. Dkt. 68 at 5. According to the Commission, the Governor's declaration makes Mr. Creech's claim "not justiciable." *Id.* The Commission previously articulated the same basic point, though it did so with reference to harmless error rather than justiciability. *See* Dkt. 12 at 17. At that stage, the courts did not embrace the theory, *see generally* Dkts. 18, 27, and it is no stronger now.

To begin, the Attorney General is mistaken to imply that the Governor's message was that he was determined to deny a commutation even if Mr. Creech convinced four Commissioners to recommend clemency. The statements by the Governor about the clemency process do not address whatsoever a hypothetical world in which the Commission had forwarded to him a favorable recommendation. Rather, he was communicating to the public that, in light of the *adverse* decision by the Commission, he would not be intervening on Mr. Creech's behalf. He never said he would have refused to weigh the Commissioner's views had they voted otherwise. "Government officials are presumed to act in good faith." *Bridge v. U.S. Parole Comm.*, 981 F.2d 97, 106 (3d Cir. 1992). The Commission's stance presumes the opposite—that the Governor is so indifferent to the opinions of the Commissioners, who he appoints, that it would make no difference to him what they thought. Such a scenario would itself be blatantly unconstitutional, as the Governor would then be "arbitrarily den[ying] a prisoner any access to

its clemency process." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998)

(O'Connor, J., concurring).

Having failed to find any purchase in mootness law, the Commission gestures confusedly

toward an entirely different set of rules, i.e., those concerning abandonment, waiver, and perhaps

even exhaustion. *See* Dkt. 68 at 5–6. In this creative part of its brief, the Commission emphasizes

the omission of the sock issue from Mr. Creech's second commutation petition. *See id.* To the

Commission, its absence means that the argument has been "abandoned," or maybe "waived."

*Id.* at 5, 6. It is difficult to engage with a theory that is so untethered from the law. The

Commission's sole citation is to *Collins v. San Diego*, 841 F.2d 337, 339 (9th Cir. 1988), a case

in which the Ninth Circuit declined to address an issue because it was not raised in the opening

brief. To again remind the Commission, it is not a court, and it is certainly not the court deciding

this case against the Commission. There is no rule that required Mr. Creech to raise any

particular issue to the Commission in order to continue pursuing the present case. There was no

rule that required Mr. Creech to submit a second petition at all. The constitutional injury for

which he is seeking redress here was fully complete upon the conclusion of the prior

commutation proceedings, when the Commission denied his petition after considering false

evidence.

Moreover, although it is irrelevant—given the incoherence of its abandonment theory—it

is also untrue that Mr. Creech's structuring of his second petition "implicitly acknowledged that

the Commission had considered and rejected his claims about the import of the ownership of the

sock." Dkt. 68 at 5. What Mr. Creech implicitly acknowledged through the sock's omission was

only that he had more significant new information to present about the Walker case. Namely, he

wished to inform the Commission that the Walker family supported Mr. Creech's request for a

commutation hearing. *See* Dkt. 68-2 at 3, 127–31. Mr. Creech was hopeful that the Commission would have enough solicitude for victims that it would seriously consider that significant new posture. Evidently, his hopes were misplaced, as the Commission went so far as to oppose the Walker family's request to participate in this case as amicus. *See* Dkt. 63 at 4–5. But the bottom line is that Mr. Creech conceded nothing about the sock. He continues to assert that the prosecution presented false evidence in displaying the sock, as he has from the first day the lawsuit began. Whether it is framed as mootness or abandonment or waiver or anything else, the second commutation petition changes nothing about the need for the Court to adjudicate the controversy between the parties.

In a final reach for a procedural obstacle, the Commission makes a halfhearted appeal to qualified immunity. *See* Dkt. 68 at 7. Whatever the merits of its underlying theory, the contention has nothing to do with the preliminary-injunction issues currently before the Court. "Qualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Lam v. City of Los Banos*, 976 F.3d 986, 997 (9th Cir. 2020). As such, qualified immunity may be raised in a party's answer, which the Commission has not yet filed. *See Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003). Nor does the defense appear in the Commission's motion to dismiss, which it has filed. *See* Dkt. 31-1. If this case survives, the Commission may assert its position on qualified immunity at the appropriate time and place. In the meantime, there is nothing about the doctrine that would prevent this Court from postponing Mr. Creech's execution—the only remedy it is currently being asked to provide. That is even truer in light of the fact that there is a second defendant—Ms. Bennetts—who has not asserted immunity, meaning that the defense would clearly not render the dispute non-justiciable for preliminary-injunction purposes.

**B.      The prior rulings do not preclude relief now.**

On the previous rulings, Mr. Creech will first rebuff the defendants on the law and then on the facts.

**1. There are no legal reasons to follow the prior rulings.**

In Mr. Creech's preliminary-injunction papers, he explained at length why the prior rulings during the last round of warrant litigation do not foreclose the remedy he is seeking now. *See* Dkt. 53-1 at 2–15. The defendants largely fail to respond to Mr. Creech's arguments. In fact, they are silent about the most important principles at issue—that a "court's findings of fact and conclusions of law made at the preliminary injunction stage are not binding in subsequent proceedings," *World Class Tech. Corp. v. Ormco Corp.*, 964 F. Supp. 2d 1273, 1279 (D. Ore. 2013), and that "decisions at the preliminary injunction phase" therefore generally "do not constitute law of the case," *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013). Nor do the defendants make a pitch for why the one exception to the usual rule is applicable here, i.e., when an appellate opinion on a preliminary injunction has "fully considered" "conclusions on pure issues of law." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1114 (9th Cir. 2007). Because they decline to deal with the governing caselaw, the defendants have insufficiently briefed the question, and the prior opinions should not be followed for that reason standing alone.

Instead of a cogent and fully articulated stance on law of the case, what the defendants offer are three isolated and undeveloped references to the previous rulings, which Mr. Creech will address in turn in the event the Court declines to follow the path set forth above.

First, the Commission resists the idea that Judge Brailsford's recusal has any impact on the question of whether the prior opinions are binding now. *See* Dkt. 68 at 14–16. Its logic is that

Judge Brailsford did not shape the record presented in the earlier preliminary-injunction appeal. *See id.* at 15–16. The Commission is demonstrably wrong. In February, Mr. Creech sought discovery in connection with his preliminary-injunction litigation. *See* Dkt. 10. Judge Brailsford denied discovery when she declined to stay the execution. *See* Dkt. 18 at 17. The appeal that arrived at the Ninth Circuit was, as a result, one with a record uninformed by discovery as a direct result of Judge Brailsford's decision. She incontrovertibly *did* shape the record on appeal.

The Commission's contrary perspective flows from the fact that Judge Brailsford did not preside over fact-finding proceedings, like a bench trial. *See* Dkt. 68 at 15–16. But the Commission's approach would create a perverse rule. Compare Mr. Creech's current case with a hypothetical scenario in which Judge Brailsford had denied the defendants' motions to dismiss and granted him a bench trial. Under the Commission's view, that ruling in Mr. Creech's favor would mean that there was a serious problem with the potential influence of bias, because Judge Brailsford would then have shaped the record. And yet in the real world, Judge Brailsford issued a ruling that was entirely adverse to Mr. Creech, denying discovery and a stay, and that means that there is less of an issue on appeal. That makes no sense.

The real upshot of the Commission's point of view is expressed when it describes who did shape the record for appeal: itself. *See id.* at 15 ("Judge Brailsford did not shape the record; the Commission did."). That is exactly right, and it is exactly what is wrong with the case. The Commission *has* shaped the record. It is a defendant in the case, accused of violating the constitutional rights of an individual and as a result sending him to the execution chamber. And yet it has blocked Mr. Creech's ability to expand the facts by successfully persuading Judge Brailsford to deny discovery. That is why the prior rulings are infected by the disqualification issue, and part of the reason why they have no preclusive power now.

Second, the Commission submits that the Ninth Circuit's approach to harmless error in the prior preliminary-injunction appeal enjoys precedential effect. *See* Dkt. 68 at 17–18. Though difficult to follow, it appears that the Commission's reasoning is essentially that even though the Ninth Circuit assumed without deciding that the *Chapman*[2] test applied, it *did* affirmatively decide that *some* harmless-error rubric was appropriate. *See id.* The problem for the Commission is that the Ninth Circuit itself said nothing of the sort. There is no discussion in the panel's opinion about Mr. Creech's argument for a per se prejudice standard, or even an acknowledgment that it was made. *See* Dkt. 21 at 6–7. The Commission cannot seriously characterize something that was at best a tacit assumption as a "fully considered" "conclusion[]" on" a "pure issue[] of law." *Ranchers Cattlemen*, 499 F.3d at 1114.

Third, the Commission rebukes Mr. Creech for endorsing this Court's previous finding that the irreparable-harm prong was satisfied, since he is disclaiming the law-of-the-case doctrine. *See* Dkt. 68 at 13. There is no contradiction. Mr. Creech does not maintain that the irreparable-harm conclusion constitutes law of the case. He simply believes it was correct, and that there is no reason to hold otherwise now.

### 2. There are substantially different facts.

As Mr. Creech established in his preliminary-injunction memorandum, there is substantially different evidence before the Court as compared to in February, thus reinforcing the need to reevaluate the issues. The defendants' best efforts to minimize that evidence fall short.

For starters, Mr. Creech presented a previously undisclosed index card from San Bernardino's Walker file confirming that he was ruled out as the perpetrator of the crime. *See*

---

[2] *Chapman v. California*, 386 U.S. 18, 24 (1967).

Dkt. 53-1 at 12.[3] The defendants both suggest that the index card sheds no light on the question of whether Ada County Prosecutor Jill Longhurst lied to the Commission, which is the heart of Mr. Creech's claim. *See* Dkt. 66 at 16; Dkt. 68 at 16. Preliminarily, the defendants both overlook the significance of other important, corroborating evidence that is also new. In addition to the index card, Mr. Creech presented new information showing that 1) Mr. Creech's "confession" to San Bernardino was demonstrably false as a factual matter based on the timeline; 2) Idaho's one-time Solicitor General did not believe the statements Mr. Creech gave about committing crimes with Carol Spaulding, a category that encompassed the Walker murder; and 3) fingerprints were taken and did not link either Mr. Creech or Mr. Spaulding to the Walker offense. *See* Dkt. 53-1 at 13–15. These are significant new pieces of evidence in their own right.

Even taken on its own terms, the defendants' dismissal of the index card is unconvincing. The crux of their argument is that Ms. Longhurst and her office, the Ada County Prosecuting Attorney (ACPA), cannot be held accountable for the misrepresentations of her colleagues in San Bernardino. *See* Dkt. 66 at 16; Dkt. 68 at 16. There are several flaws with that concept.

One is that it significantly understates both the degree of Ada County's knowledge and the gap between that knowledge and the office's sensationalistic statements about Mr. Creech's guilt. The only real "evidence" that the ACPA has ever pointed to in order to justify its decision to declare Mr. Creech responsible for the Walker murder has been his "confession." *See, e.g.*, Dkt. 66 at 13. Mr. Creech has already proven that the "confession" as a whole was a ludicrous

---

[3] The Commission raises authentication concerns about the index card. *See* Dkt. 68 at 16 n.3. However, as Defendant Bennetts realizes, the card came from the Walker family. *See* Dkt. 66 at 16. To the extent further authentication is required, Mr. Creech has provided it in an attached declaration from counsel. *See* Ex. 2; *see also Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (noting that formal evidentiary requirements should not be rigorously enforced in this context because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain" the best possible evidence).

fiction and involved claims to murders that never even happened. *See, e.g.*, Dkt. 4-1 at 11–12.

What is critical for present purposes is that Ada County was fully aware of the statement at issue.

The only transcript of any arguable "confession" that Mr. Creech has access to is one that was

conducted in part by Ada County Sheriff Chuck Palmer, along with San Bernardino law

enforcement. *See* Dkt. 4-5 at 2. That interview was obviously conducted with an eye to

implicating Mr. Creech in the Walker murder. *See* Dkt. 4-1 at 8–9. And after the interview, Mr.

Creech was not charged—nor has he ever been in the fifty years since. Ada County was

accordingly fully aware of the key facts proving the falsity of its own prosecutor's claim. The

index card verifies the same narrative, and it is therefore highly probative. Ada County cannot

excuse its own prosecutor for presenting false evidence when its agents had all of the

information necessary to know it was false. *See Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir.

2016) (holding the government as a whole accountable for the presentation of false evidence

"when *any* of the State's representatives would know the testimony was false" (emphasis in

original)).

It is also critical to be precise in articulating what exactly the false statement at issue was.

Namely, what was false was for the prosecutors to claim that Mr. Creech had been "positively

identified as the murderer," Dkt. 12-2 at 26, and that the case had been "solved," Dkt. 4-3. The

defendants want the false statement to instead be about whether Mr. Creech was guilty or not.

Then, they can give Ms. Longhurst plausible deniability by falling back on the truism that it will

ultimately be impossible to know with certainty what happened in San Bernardino in 1974. *See*

Dkt. 68 at 16 ("Whether or not Creech committed the Walker murder is not the purview of this

tribunal."). Regardless of whether one agrees with that theory, it is irrelevant. Ms. Longhurst's

claim to the Commission was that the case had been *solved* and her office *was* in a position to

know it was false because Ada County was clearly involved in the investigation into the Walker murder fifty years ago and clearly aware that the plug had been pulled on it—as the index card shows.

Even apart from imputation, Ms. Longhurst was well-situated to personally understand the falsity of her statement. That is demonstrated by a document that the ACPA has itself now provided to the Court, which is yet another new piece of evidence weighing in Mr. Creech's favor. The document is a letter that the San Bernardino District Attorney's Office sent to the ACPA on January 18, 2024—one day before Mr. Creech's clemency hearing. *See* Dkt. 66-1 at 4. In the letter, the San Bernardino prosecutors express their "*belief* . . . that Mr. Creech committed the murder of Daniel Walker." *Id.* Defendant Bennetts attempts to shield her former subordinate with the letter. "What Ms. Longhurst did have," Defendant Bennetts stresses, "was a letter with a known date and signatory that unambiguously states that San Bernardino County believes Creech murdered Walker." Dkt. 66 at 16. Initially, a prosecutor's belief does not solve a crime. More importantly, Ms. Longhurst also knew what the belief was based on—"Creech's statements in 1975." Dkt. 66-1 at 4. And she had every reason to understand that she was not reading a legitimate presentation of proof. She was reading a transparent ploy to cook up a story for a clemency hearing being held the next day. Since the letter was designed "to formalize . . . ongoing discussions," *id.*, there is little doubt that Ms. Longhurst and her colleagues were themselves part of the ploy. They asked for "proof" of a murder to railroad Mr. Creech with the next day and they got it. That is hardly evidence of Ms. Longhurst's innocence.

It is especially striking that Ms. Longhurst would the next day inform the Commission that Mr. Creech had been "positively identified as the murderer." Dkt. 12-2 at 26. As it happens, the letter stated the opposite. The single witness to the crime had been shown a "photo array

which included Creech's picture" and he was "*unable* to make an identification." Dkt. 66-1 at 4.

That is a contradiction plain enough to represent its own independent falsehood. And it is an

additional reason why new evidence supports Mr. Creech's claim.

Assuming arguendo that the San Bernardino letter gave Ms. Longhurst some of the cover

that it was cynically designed to provide, it would not defeat Mr. Creech's claim. A prosecutor

can be liable for the presentation of false evidence in violation of the Constitution even when she

is not one hundred percent sure of the falsity. *See Lisker v. Knowles*, 651 F. Supp. 2d 1097, 1139

(C.D. Cal. 2009) (granting relief on a similar theory and explaining "it cannot be the case that the

prosecutor's technical ignorance of the falsity of that evidence insulates the proceedings against a

due process claim"); *see also Cruz v. Kauai Cty.*, 279 F.3d 1064, 1068–69 (9th Cir. 2002)

(observing that a Fourth Amendment violation can occur when a prosecutor obtains a warrant

based on allegations from others "without investigation" that are "in reckless disregard of" the

truth even when there is no evidence the prosecutor herself knew they were false). It is the height

of reckless disregard for a prosecutor to proclaim at a capital clemency hearing that a fifty-year

murder case has been solved on the basis of a single one-page jury-rigged letter relying on long-

rejected "evidence."

There is yet another new piece of evidence for the Court to consider that was not a part of

the previous preliminary-injunction litigation. It comes in the form of a declaration by Doug

Walker, Daniel's brother. *See* Dkt. 63-2. The declaration helps to fill out the real nature of the

interactions between Ada County and San Bernardino. Contrary to Defendant Bennetts'

depiction, this is not a tale of law enforcement in Idaho and California working together in good

faith to solve a mystery. It is a tale of authorities in both states manipulating a capital clemency

proceeding so that they could both get plaudits for pretending to close a cold case and notches on

their belt for sending a man to his execution, with the added benefit of burying any chance of having to defend their allegations in court.

As the Walker family recounts, it was not even told the name Tom Creech until January 16, 2024. *See id.* at 2. That is despite the fact that it was on November 15, 2023, that the San Bernardino Sheriff's Department "resumed the investigation into the murder of Daniel Walker." Dkt. 4-4. It is no secret what triggered this "investigation." Mr. Creech filed his first commutation petition with the Commission on October 13, 2023 and a hearing was granted five days later. *See* Dkt. 30 at 5. After a hearing was granted, the ACPA presumably started casting around for additional crimes it could pin on Mr. Creech, landed on the Walker case, and reached out to San Bernardino authorities to enlist them in the cause. Both Ada and San Bernardino Counties then elected to wait two months to call the Walker family on January 16, 2024—three days before the clemency hearing. *See* Dkt. 63-2 at 2. They did so to press the family to "provide a victim impact statement to use in Creech's clemency hearing." *Id.* at 3. In return for providing the letter, the family was promised it could have access to the Walker file so long as he "agree[d] to close the case with Creech as the perpetrator." *Id.*

In short, the declaration is a crucial new piece of evidence demonstrating that Ada County and San Bernardino were working hand in glove to use the Walker case to make headlines, win the clemency proceeding, and execute Mr. Creech. Under those circumstances, it is unavailing for the ACPA to now hide behind San Bernadino. They were incontrovertibly acting in concert. It is also remarkable, under those circumstances, to see the Commission charging *Mr. Creech's counsel* with "shamelessly exploit[ing]" the Walker family. Dkt. 68 at 14; *but see* Dkt. 63-2 at 6 (the Walker family expressing its concern that it was "manipulated into participating in Creech's clemency hearing" by prosecutors in Ada County and San Bernardino).

Consolidated Reply in Support of Emergency Motions - 15

Moving from the Walker case to the sock, the new piece of evidence that Mr. Creech underscored in his moving papers was the ACPA's abrupt re-characterization of the PowerPoint slide at oral argument in the Ninth Circuit. *See* Dkt. 53-1 at 7. In particular, Mr. Creech observed that the ACPA at oral argument suddenly described the circled sock not as the one that matched the murder weapon but rather as one that matched the sock right beside it in the same photograph. *See id.* Opposing counsel now posits, without citation or quotation, that at oral argument he actually did not "state that the two socks in the picture matched each other." *See* Dkt. 66 at 14. To see through opposing counsel's revisionist history requires only three seconds of the Court's time. At oral argument, Judge Bybee gave opposing counsel a simple directive: "Tell us what the photo is." Oral Arg. at 27:08–09.[4] Opposing counsel responded: "The photo *is a picture of matching socks*." *Id.* at 27:18–20. There is nothing ambiguous about that statement. Unless the ACPA suspects that Mr. Creech has somehow hacked into the Ninth Circuit's YouTube channel, opposing counsel has to deal with his new representation. He has not done so, leaving a significant new piece of evidence unaddressed.

### C.    The preliminary-injunction factors favor Mr. Creech.

Having established that a new preliminary-injunction assessment is warranted, Mr. Creech will now address why it should turn out in his favor.

### 1.    Mr. Creech is likely to succeed on the merits.

The first preliminary-injunction factor is the likelihood of success on the merits. Mr. Creech will run through four issues in regards to the likelihood of success on the merits: the presentation of false evidence in a clemency proceeding as a legitimate cause of action under the

---

[4] Available at https://www.youtube.com/watch?v=8tYVRTyoykg.

Due Process Clause; the falsehood of the Walker evidence; the falsehood of the sock evidence; and prejudice.

a)      **Mr. Creech's claim is cognizable.**

As she consistently has throughout the life of this case, Defendant Bennetts expends considerable energy constructing the legal architecture that would make it constitutionally permissible for her subordinates to present false evidence at clemency proceedings. *See* Dkt. 66 at 8–12. Mr. Creech has already articulated why Ms. Bennetts is off-base about the scope of due process claims. *See* Dkt. 4-1 at 2–3; Dkt. 15 at 4. More recently, Mr. Creech has observed that the Ninth Circuit manifestly disagrees with Defendant Bennetts' view that a judicial inquiry into the falsehood of a statement at a clemency hearing constitutes a forbidden review of the substance of the hearing. *See* Dkt. 53-1 at 6. Instead of responding, Defendant Bennetts merely recycles her boilerplate treatise on the acceptability of prosecutorial falsehoods in clemency proceedings. *See* Dkt. 66 at 8–12. Indeed, Defendant Bennetts' indifference to judicial norms is exemplified by her decision to gratuitously critique a published Ninth Circuit opinion and champion a dissent. *See id.* at 10. Because Defendant Bennetts has not grappled with the Ninth Circuit's language, she has forfeited the point, and this Court can proceed on the basis that it is unconstitutional for prosecutors to lie in clemency proceedings.

b)      **Ms. Longhurst lied about the Walker case.**

Although the defendants type the word "Walker" many times in their respective responses, it is rarely to defend the veracity of what Ms. Longhurst actually claimed about the case. Mostly, it is instead to suggest that any duplicity can be written off as harmless. *See, e.g.*, Dkt. 66 at 16–18. The closest the defendants come to engaging with the heart of the matter is when the Commission denies that Ms. Longhurst "deliberately fabricated false evidence." Dkt.

68 at 16 (cleaned up). In the Commission's view, Ms. Longhurst was simply expressing her

"opinion," which "hardly constitutes deliberate fabrication of any *facts or evidence*." *Id.* at 17

(emphasis in original). The Commission is perhaps suggesting that only the fabrication of

evidence, and not a false statement, gives rise to a due process claim. If so, it is in error. The case

it cites was not establishing any such rule. Rather, it was simply quoting from Justice Stevens'

concurrence in *Woodard*. *See Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002). For his part,

Justice Stevens was explaining why he took exception to the view that a clemency proceeding

can "*never* violate the Due Process Clause." *Woodard*, 523 U.S. at 290 (Stevens, J., concurring)

(emphasis in original). "[U]nder such reasoning," Justice Stevens warned, "even procedures

infected by bribery, personal or political animosity, or the deliberate fabrication of false evidence

would be constitutionally acceptable." *Id.* at 290–91 (Stevens, J., concurring). In other words,

this was a parade of horribles. For Justice Stevens, "the deliberate fabrication of false evidence"

was simply one of several actions that would obviously be unconstitutional—though regrettably

not obvious to the defendants here.

Neither Justice Stevens nor the *Anderson* panel suggested that false statements are okay

while false evidence is not. Such a distinction would not be consistent with how prosecutorial

misconduct is weighed in the trial context. *See, e.g.*, *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir.

1994) (finding prosecutorial misconduct in part because of misrepresentations made in closing

argument); *Hayes v. Brown*, 399 F.3d 972, 979 (9th Cir. 2005) (finding prosecutorial misconduct

because the prosecutor "misled the trial judge" regarding the existence of a plea deal for a

witness, even where the witness had no knowledge of that deal); *Stermer v. Warren*, 959 F.3d

704, 727–32 (6th Cir. 2020) (explaining at length that "a prosecutor cannot misrepresent facts in

evidence" by opining the defendant was a liar when there are no facts in evidence to support that opinion).

It is also misleading for the Commission to describe Ms. Longhurst's statements as no more than an "opinion." Dkt. 68 at 17. To be sure, Ms. Longhurst's view that Mr. Creech "was getting away with murder" was an opinion. *Id.* If she said just that, there might not be a viable claim. But she said more. As outlined above, Ms. Longhurst attested that Mr. Creech had been "positively identified as the murderer," Dkt. 12-2 at 26, and that the case had been "solved," Dkt. 4-3. Those are not opinions—they are statements of fact. And they were both false.

Two remaining arguments of Defendant Bennetts merit a brief rejoinder. The first relates to Defendant Bennetts' lengthy exegesis on her office's correspondence with the San Bernardino authorities. *See* Dkt. 66 at 15. Her account is essentially that San Bernardino told her office everything it needed to know. *See id.* The defect in this picture is that San Bernardino was acting at Ada County's bequest and was not at all an innocent actor in its own right. This was a coordinated effort and Mr. Creech has established as much above. *See supra* at Part I.B.2. Here, it is worth adding one more basic point. The recently revealed letter from San Bernardino to Ada County, sent the day before the clemency hearing, claims: "Creech's statements in 1975 were not, at the time, successfully linked to the unsolved homicide of Daniel Walker." Dkt. 66-1 at 4. But the new evidence shows that Mr. Creech was tied to the Walker case from the get-go. The names Daniel Walker and Thomas Creech are on the first page of the police report Mr. Creech filed with his moving papers—a report prepared more than forty-nine years ago. *See* Dkt. 53-2 at 2. It is true that Mr. Creech was not "successfully linked" to the crime in the sense that it was solved, since law enforcement plainly and correctly rejected his statements as incredible. And it is no more successfully linked now. Literally nothing has changed between 1975 and 2024, as far

as either of the defendants have said through nine months of litigation, that has given them a single shred more evidence. That is why it was false for Ms. Longhurst to declare the case solved at the clemency hearing.

**c)      Ms. Longhurst lied about the sock.**

Since this lawsuit's inception, a central element in it has been that Ms. Longhurst falsely told the Commission through her words and PowerPoint that the murder-weapon sock bore Mr. Creech's name on it. *See* Dkt. 1 at 20–24. Before the lawsuit began, there was extensive correspondence over the sock, during which prosecutors tellingly failed to suggest that the image was not the murder weapon, seemingly accepting undersigned counsel's assumption that it was. *See* Dkt. 15 at 10–13. In nine months of extensive litigation, Mr. Creech has stated and re-stated that same obvious proposition: the only possible reason to circle a sock with the name "Creech" on it and place it next to text about what name was on "the weapon" is to show that "the weapon" said "Creech." *See, e.g.*, Dkt. 15 at 9–17. In nine months of litigation, the defendants have never proposed any account of the slide that would explain how it meant something other than what it was obviously intended to portray. Instead, the Commission has been notably silent on the matter while Defendant Bennetts' evolving statements have now settled on the notion that the circled sock in the photograph *matched* the murder weapon. *See* Dkt. 66 at 14. With nine months to brainstorm, Defendant Bennetts has still been unable to even try to articulate *why* Ms. Longhurst would show a sock that *matched* the murder weapon. Nor has she mustered any argument as to why she would circle a name on a sock and place it next to text about a name on a murder weapon if *not* to signal that the murder weapon had Mr. Creech's name on it.

Mr. Creech acknowledges that in the haste of the prior preliminary-injunction litigation both this Court and the Ninth Circuit accepted the proposition that the circled sock was

characterized to the Commission as the matching item and not the murder weapon. Respectfully, though, the courts—like Defendant Bennetts—never reckoned with *why* it would make sense for Ms. Longhurst to circle a matching sock when she was supposedly rebutting a point about what the *murder weapon* had written on it. Mr. Creech implores the Court to recognize the reality Defendant Bennetts has been willfully avoiding for nine months: her office displayed a photograph meant to be of the murder weapon, and it was false.

### d)   Prejudice is presumed or present.

As with many of the other issues before the Court, the defendants deal with the prejudice question by ignoring the two arguments Mr. Creech made in his moving papers: that the record is insufficient to permit harmless-error review, making the errors per se prejudicial; and that, in the alternative, harmfulness must be considered in light of how the violations—if exposed—would have not only revealed two particular assertions to be false, but would have more generally impressed upon the Commission that the State's representative was a liar. *See* Dkt. 53-1 at 16–19. In light of the defendants' silence, the questions should both be answered in Mr. Creech's favor.

One additional observation Mr. Creech wishes to make relates to the number of victims. As he has consistently done here, Mr. Creech acknowledges that his several murder convictions are serious crimes. It was appropriate for the prosecution to present them in clemency and for the Commissioners to rely upon them. But the shell game that the defendants are playing with this subject is not appropriate, and it does not foreclose a finding of prejudice.

In their latest filings, the defendants both repeatedly rely on statements made by the Supreme Court when it reviewed Mr. Creech's original sentencing in 1993. *See* Dkt. 66 at 2; *id.* at 8 n.5; *id.* at 17; Dkt. 68 at 5 n.1; *id.* at 11. There, Justice O'Connor wrote that Mr. Creech had

"admitted to killing or participating in the killing of at least 26 people." *Arave v. Creech*, 507 U.S. 463, 465 (1993). Because the defendants place so much weight on the Supreme Court's version of events, it is fair for Mr. Creech to briefly examine it here.

The trial that gave rise to this history was, in a word, a farce. At that trial, Mr. Creech was represented by Bruce Robinson, who "believed he had exclusive book and movie rights to the story of Tom's life." Ex. 3. Mr. Robinson regarded the central issue in the case as "the realism of God and the existence of Satan." Ex. 4. To prove as much, Mr. Robinson intended to saddle Mr. Creech with as many murders as he could—real or imagined—and therefore subjected his client to an interview under "truth serum" administered by a doctor who also acquired rights to Mr. Creech's life story. Ex. 5. The result was not twenty-six murder confessions but *forty-two*, most of them spoon-fed to Mr. Creech. *See* Ex. 6. Many of these murders were demonstrably fictitious even at the time. *See, e.g.*, Ex. 7 (reflecting the statement of a sheriff who found a supposed victim alive and in good health). Mr. Robinson's theory of the case was that Mr. Creech committed these myriad murders as an enforcer for a satanic motorcycle gang—a gang that also implicated a Senator and two Governors, one of whom aptly responded: "I have no comment to make about such ravings." Ex. 8. These "ravings" were the foundation for the twenty-six-murder estimation that appears in the defendants' responses now. And they were the foundation for Ms. Longhurst's even splashier claim to the Commission that Mr. Creech had committed "more than *fifty* murders." Dkt. 12-2 at 24. The basis for all of this is pure fantasy, and it thoroughly undermines the defendants' handling of harmless error.

What likewise undermines their handling of the issue is the disingenuousness of Defendant Bennetts' current position. Defendant Bennetts now reduces the significance of the Walker case to the vanishing point so that she can emphasize Mr. Creech's other crimes. *See*

Dkt. 66 at 16–18. But it was Defendant Bennetts' office that made Mr. Walker such a significant part of this case. The prosecutors chose to contact the Walker family three days before the clemency hearing to extract a statement from them. *See* Dkt. 63-2 at 2. They chose to announce at the hearing that Mr. Creech had been declared guilty of a fifty-year-old murder. *See* Dkt. 12-2 at 26. They chose to include Mr. Walker as the only other victim in their press release apart from David Jensen after the hearing so as to produce as much coverage as possible. *See* Dkt. 4-3; Dkt. 15-13. Defendant Bennetts' office made all of those decisions. Nothing forced her to do so. The death of Daniel Walker apparently mattered to her when it was a lever to help her get to an execution. Now that the death has served her purpose, Defendant Bennetts can safely minimize it again. It would be unseemly to reward Defendant Bennetts for manipulating the system in this way. A ruling that the error was harmless sends the message that a prosecutor can lie with impunity in clemency so long as there are enough other crimes for her to fall back on. But if Defendant Bennetts wished to rely on the legitimate crimes, her office should have stuck to them at the hearing. Having refused to do so, she should not get the benefit of the doubt, and it would be improper to withhold a preliminary injunction based on harmless error.

As to the sock, the defendants cannot satisfy their burden of proving the error harmless to the satisfaction of the demanding reasonable-doubt standard. Defendant Bennetts remarks that "[t]he Commissioners put in writing their reasoning for their votes, and this reasoning never mentions the sock." Dkt. 66 at 16. It is true that the Commissioners never wrote the word "sock" down. But that is too narrow a lens. In announcing their votes, the very first consideration identified by the three Commissioners against clemency was "the coldblooded nature" of the Jensen murder. Dkt. 12-3 at 43. That is precisely why the photograph of the sock is so significant. The relevance of the sock to the ACPA was that it supposedly proved that Mr.

Creech was part of the scheme to induce Mr. Jensen to start the fight and then kill him. *See* Dkt. 4-1 at 16. It was heavily disputed at the clemency hearing who started the fight. Defendant Bennetts now opines that Mr. Creech "does not challenge the findings of the judge that sentenced him to death in 1995," who found that "[a]ll the weapons which were used in this murder were made by Tom Creech." Dkt. 66 at 14. That is inaccurate. Mr. Creech did contest that finding at the clemency hearing and he continues to do so. At the hearing, Mr. Creech instead relied on the same judge's statement in 1982, much closer in time to the offense, "that Mr. Creech was attacked by the victim without provocation." Dkt. 12-2 at 22. There was nothing binding the Commission to the 1995 findings instead of those from 1982. Under Idaho law, the Commission can recommend commutation for any reason it regards as appropriate. *See generally* Idaho Const., Art. IV, § 7; Idaho Code § 20-1016. The ACPA had an explosive new piece of evidence to support its narrative about the cause of the fight—the murder weapon. Ms. Longhurst presented the evidence, and three Commissioners then agreed with her that it was a "coldblooded" murder, Dkt. 12-3 at 43, instead of an overreaction to a fight started by the victim. The defendants cannot prove the error harmless under those circumstances just because the word "sock" is missing from the Commissioners' statement of reasons.

Since the explanation for the three negative votes are so unhelpful to its perspective, the Commission turns to the statement made by the three members who would have recommended clemency. *See* Dkt. 68 at 11. These individuals, the Commission maintains, "did not disregard the coldblooded nature of David Dale Jensen's murder," and instead were moved by "the passage of time and the judge and prosecutor of [Mr. Creech's] case advocating against" execution. *Id.* The Commission proves Mr. Creech's point. Both sets of Commissioners—those in favor of commutation and those against—were swayed by the prosecutor's story of the crime,

Consolidated Reply in Support of Emergency Motions - 24

a story that was facilitated by the false evidence. If anything, that underlines how damaging the violation was. And the fact that the outcome was nevertheless a tie vote, where a single additional Commissioner on his side would have tipped the scales for Mr. Creech, is powerful evidence in favor of harmfulness. *See United States v. Beckman*, 222 F.3d 512, 525 (8th Cir. 2000) (deeming an error harmful where a previous trial without the violation resulted in a hung jury).

### 2.     The balance of equities favor an injunction.

In regard to the equities, the Commission champions "the community and [the] victims." Dkt. 68 at 13. It then immediately discounts the expressed interest of the victims who are actually participating in the litigation: the Walker family. *See id.* at 14. "Because the Walker family wants the chance to finally get answers about Daniel's murder, they support Creech's motion[] for a preliminary injunction." Dkt. 65 at 7. The Walker family "question whether Daniel's murder was pinned on a convenient scapegoat." *Id.* at 6–7. They have been pulled into the case because "[t]he state of Idaho claims that Daniel Walker is a murder victim of Thomas Eugene Creech," and as a result they are voicing their "right to be treated fairly and with dignity" and their "right to be heard." *Id.* at 7.

The defendants do not hear them. Defendant Bennetts ignores the Walker family now that she is finished using them to secure an execution. And the Commission goes so far as to tell the family that "this litigation is not the proper venue" for them to find answers. Dkt. 68 at 14. What is the proper venue then? Mr. Creech is scheduled to be executed in nine days. As the Walker family explain, if the execution goes forward, they will "live with the uncertainty of whether Creech was responsible for Daniel's murder for [the] rest of their lives." Dkt. 65 at 9. The most natural way to try to resolve the uncertainty would be through a trial, the process designed to

shed light on whether an individual has committed a crime. But in the new letter from San Bernardino that the defendants have finally disclosed, it is clear that the authorities there have no interest in pursuing the truth through a trial or through any other means. Although "the requisite proofs of evidence exist," the District Attorney assures us, he would rather not tell the world (or a jury) what it is, since it is more politically expedient that the accused simply be put to death. The Commission also had an opportunity with Mr. Creech's second commutation petition to use its powers to honor the Walker family's request and help find the truth. For the Commission too, though, an execution is easier at this point. Only this Court is in a position to give the Walker family the information they are surely entitled to about the loss of their loved one after prosecutors in two states have used the crime to great effect to earn a win at a clemency proceeding. The Walker family has a powerful equitable interest here. Contrastingly, the equities do not recognize prosecutors' interest in declaring a crime solved so as to facilitate an execution and then walking away from the accusation as soon as they are questioned on it.

## II.     Expedited discovery is warranted.

On Mr. Creech's motion for discovery, the defendants argue the request is too broad. *See* Dkt. 67 at 7–8. However, Mr. Creech's discovery requests are confined to two narrow topics: first, the veracity of the prosecution's statements to the Commission about the Walker murder, and second, the nature and provenance of the sock from the PowerPoint slide and how it was used in the prosecutor's case against clemency. *See* Dkt. 55-1 at 5.

As a preliminary matter, Mr. Creech must respond here to the Commission's treatment of the record. *See* Dkt. 68 at 15–16. The Commission's claim that Judge Brailsford did not shape the record, despite the Ninth Circuit's caution to the contrary, *compare* Dkt. 68 at 15–16, *with* Dkt. 59 at 24, is very much related to Mr. Creech's request for expedited discovery. In its

argument, the Commission appears to be saying that since Judge Brailsford decided not to allow development of the record there was no record for her to shape in the first place. But of course, in denying Mr. Creech's first motion to expedite discovery, Judge Brailsford did shape the record by not allowing any development into whether the prosecutor lied during the clemency proceeding. *See* Dkt. 18 at 17. That is one of the principal reasons why it is appropriate for discovery to take place now.

Relatedly, Mr. Creech had to litigate Judge Brailsford's recusal over the course of five months. In all that time, the case could have progressed well into discovery by this point. In other words, were it not for Judge Brailsford's friendship with Defendant Bennetts, the case would now already be in discovery and there would be no need for the present motion. Suggestively, neither of the defendants now contends that the Court would have dismissed Mr. Creech's amended complaint for failure to state a claim, which is the only thing that could potentially have stood in the way of discovery. But that discovery never occurred. Instead, the Ninth Circuit issued its ruling in favor of Mr. Creech on the bias issue on October 16, 2024, and then on that same day the ACPA obtained the death warrant. Both by not allowing expedited discovery and then by refusing to recuse herself, Judge Brailsford has shaped the record because her decisions are the reason Mr. Creech hasn't received access to essential information relevant to his motion for a preliminary injunction. Mr. Creech should not be penalized for rightfully seeking recusal, especially when the Court considers the limited nature of his requests.

Contrary to the ACPA's arguments against expedited discovery, the specific information Mr. Creech is requesting does not resemble the open-ended discovery requests that courts have been wary of granting. For example, Mr. Creech's requests couldn't differ more from the plaintiff's in *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063 (C.D. Cal. 2009), the case most

heavily relied upon by Defendant Bennetts, *see* Dkt. 67 at 5–7. Unlike the plaintiff in that case, Mr. Creech has limited the scope of his requested depositions to the two topics at issue. *See Am. LegalNet*, 673 F. Supp. 2d at 1068 (noting a failure to limit the scope of the requested depositions). Mr. Creech is additionally not requesting anything approaching a full transfer of any party's hard drives, as the plaintiff there did. *See id.* The district court in *LegalNet* found that the plaintiff had "shown no nexus between" the discovery requests at issue "and the preliminary injunction relief" being sought. *Id.* at 1069. By contrast, there is a firmly established nexus between Mr. Creech's requests and the Walker murder and sock respectively, the two discrete factual matters implicated by this preliminary-injunction litigation.

The purpose of expedited discovery pending a preliminary injunction is to provide information that would "better enable the court to judge the parties' interests and respective chances for success on the merits." *Edudata Corp. v. Sci. Computs., Inc.* 599 F. Supp. 1084, 1088 (D. Minn. 1984). Mr. Creech's requests are confined solely to developing the record to better aid the Court in its decision on the chances of success on those two narrow topics—the Walker murder and the use of the sock. There is compelling new evidence that supports the allegation that the prosecution lied to the Commission, *see, e.g.*, Dkt. 53-1 at 11–15, and yet basic and essential information remains hidden from Mr. Creech and the Court.

First, in terms of the sock, Mr. Creech has asked for relevant information that would be easy for the ACPA and the Commission to produce. For example, he has asked for a transcript and/or a recording of the clemency hearing if it exists. *See* 55-1 at 9. Either the defendants have this already and it is accessible, or they don't. Significantly, Ashley Dowell, who was the Executive Director of the Commission at the time of the clemency hearing, was quoted in the media a few years ago as endorsing her predecessor's decision to require "audio recordings of *all*

hearings." Ex. 9 at 2. Yet in nine months of litigation the Commission has never even said whether such a recording exists, and it prevented anyone else from making one. *See* Dkt. 15 at 15. Instead of a recording, the Commission has relied entirely on minutes that it—a defendant—prepared after it was sued, by an unknown person, using unknown methods, and containing undeniable errors. *See id.* at 15–16. The Commission is deliberately obstructing the development of the record so that its own self-serving representations are the only evidence available. Having created the lack of information, the Commission cannot complain about the need for discovery.

Similarly, records related to the sock should also be easily available for the defendants to produce. It would be equally simple for Defendant Bennetts to provide undersigned counsel with access to the murder weapon, which the ACPA has as well. *See* Oral Arg. at 28:33–28:42. The ACPA has given multiple and diverging accounts of this sock, *see* Dkt. 53-1 at 6–8; *supra* at Part I.B.2, and limited discovery would help the Court in deciding if Mr. Creech is likely to succeed on the merits and if any of the prosecution's accounts of this sock are true. Importantly, Defendant Bennetts continues to tell the Court, to this day, that the purpose of the photograph Ms. Longhurst displayed was to rebut Mr. "Creech's assertion that the murder weapon had the name 'Garza' on it." Dkt. 66 at 13. Yet Defendant Bennetts has never even attempted to explain how a photograph of a sock can rebut that assertion when the image is not of the murder weapon itself. What can a matching sock show, other than that Mr. Creech wrote his name on an item he owned and that had no connection to the crime? The evidence that would cut to the heart of Mr. Creech's claim is evidence about the murder weapon itself. Defendant Bennetts has sole custody of that evidence. It is a tailor-made subject for easy, straightforward discovery.

Second, regarding the Walker murder, the amount of evidence that supports a preliminary injunction has completely changed the present motion from the previous one decided by the

Court. *See* Dkt. 53-1 at 11–15. However, key questions remain. Both Mr. Creech and the Walker family agree there are serious doubts about whether there was any "thorough investigation" into Daniel Walker's murder before the prosecution stated there was. *See* Dkt. 63-2 at 2 (the Walker family stating its belief that, based on information available to it, the prosecution's statement was untrue). Limited discovery would clarify whether Mr. Creech is likely to succeed on merits of his claim that the prosecution lied to the Commission about the Walker case. Much of this information could be easily made available to Mr. Creech.

As an example, the ACPA was, after nine months of resistance, able this week to easily produce a letter dated January 18, 2024, from San Bernardino in opposition to Mr. Creech's motion for a preliminary injunction. *See* Dkt. 66-1 at 4. All other similar communications, as requested by Mr. Creech, *see* Dkt. 55-1 at 10, would assist the Court in deciding that motion as well, not just the one communication cherrypicked by the ACPA. Furthermore, that one letter itself reveals that it was merely meant "to formalize . . . ongoing discussions." Dkt. 66-1 at 4. The ACPA chose to reveal only this letter without providing Mr. Creech or the Court with any information about what occurred during these "ongoing discussions." It is the earlier exchanges that have the most bearing on Mr. Creech's claim. They are the ones in which Ada County and San Bernardino came up with the joint plan to extract a statement from the Walker family supporting an execution while wielding access to the file as leverage. *See supra* at Part I.C.1.b. That is where Ada County's knowledge of the falsity of its claim would be proven. Expedited discovery is necessary here when the ACPA reveals only part of a conversation and then asks the Court to rely on the absence of the most essential information in ruling against Mr. Creech.

The newly disclosed letter from Ada County also makes additional targeted discovery vital. We now know the names of two lawyers in the San Bernardino District Attorney's Office

who were directly communicating with Ada County about the Walker case: Lloyd Masson and Jill Gregory. See Dkt. 66-1 at 4. Since Ada County is currently hiding behind San Bernardino as the only source of real information about the Walker case, depositions of Mr. Masson and/or Ms. Gregory are key. They are the ones who can speak to what Ada County knew about its false statements and when.

An area that also continues to remain murky is how much due diligence went into the prosecution's claim that the Walker case was solved and that Mr. Creech did it. For example, on the question of the exculpatory index card, *see* Dkt. 53-1 at 12, the ACPA states, "It appears this document was unknown to either party," Dkt. 66 at 16. Mr. Creech respectfully responds that the Court should know for certain if that document was or was not known to the prosecution at the time of the clemency hearing. Discovery would get us closer to figuring out with certainty whether it's true that the prosecution didn't know about the card or if it only "appears" that way. And, more generally, did the prosecution do any due diligence in terms of reviewing San Bernardino's file at all before stating in multiple forums that Mr. Creech was the killer? The Court should decide the motion for a preliminary injunction on the basis of facts. Facts come from discovery—not from throw-away sentences in unsworn briefs written by lawyers pushing for an imminent execution.

In addition, there is the new information that Mr. Creech only recently became aware of. *See* Dkt. 53-1 at 11–14. With this new information, counsel can even further target their request for information. For example, it has also come to counsel's attention that the San Bernardino Sheriff obtained both Mr. Creech's and Ms. Spaulding's fingerprints and ran them against evidence in the Walker case. *See* Dkt. 53-2 at 5–6. It appears these fingerprints didn't match any of the fingerprints lifted at the crime scene. *See id.* at 6. This is yet another key fact the

prosecution did not reveal to the Commission at the clemency hearing. Mr. Creech would like the opportunity to ask Tom Taylor about this. Mr. Taylor appears to be the person who provided the "new" information about Mr. Creech. *see* Dkt. 55-1 at 7. He also was responsible for sending Ms. Spaulding's fingerprints. *See* Ex. 10. It would be illuminating to depose Mr. Taylor about these and any other exculpatory evidence he omitted in his sudden recollections about the Walker case that proved so consequential to the prosecutor's clemency presentation.

In summary, contrary to the defendants' position, Mr. Creech's requests are limited and directed at providing the Court with a record that is developed enough to give a clear picture of the parties' chances on the merits. To the extent the Court disagrees, more restricted discovery remains available. The defendants at a minimum should be ordered to comply with Mr. Creech's requests for production, Dkt. 55-1 at 8–10, interrogatories, *id.* at 10–11, and request for access to the murder weapon, *id.* at 13, all of which would aid the Court in its decision on the motion for preliminary injunction. To rule otherwise would allow the ACPA and the Commission to control the development of the record with the selective disclosures made in this litigation. As the Commission agrees with Mr. Creech, the Walker family does deserve to know what happened to Daniel. *See* Dkt. 68 at 14. Where they disagree is whether or not this is the proper forum. By lying about Mr. Creech's role in the Walker murder as a convenient way to both persuade members of the Commission and to quickly dispose of the Walker case, the ACPA and the San Bernardino authorities made this the only venue where the truth has any chance of coming to light. Indeed, in separate public records litigation, San Bernardino County is also blocking access to any information, stonewalling, and throwing up procedural obstacles, all in the hope that the Walker case goes away and that its authorities never have to explain themselves to anyone for sending a man to his death. *See* Ex. 11 at 17–25; *see also* Ex. 12. Put simply, the ACPA—along

with its allies in California and the Commission—made this court the venue, and that's why discovery here is appropriate.

One other type of discovery is indispensable, even if the Court denies certain requests. That is to hear from Ms. Longhurst under oath. She is at the center of the misconduct that occurred at the clemency hearing. Ms. Longhurst told the Commission the Walker case was solved and she showed it the sock. Notwithstanding her centrality, Ms. Longhurst's former employer, the ACPA, has never produced a single statement from her under oath. There is nothing at stake when the ACPA's civil lawyer offers a "vehement denial" in an unsworn brief. Dkt. 66 at 13. If the prosecutors are so confident in the truthfulness of their agents, let them produce the person with the most direct knowledge. Because they are unwilling to do so, discovery is warranted.

## III.    An administrative stay is called for.

With respect to Mr. Creech's motion for an administrative stay, the best place to begin is the Commission's mischaracterization of the governing legal standard. The Commission contends that the administrative stay is judged by "the same standard as a preliminary injunction" and therefore requires "a strong showing that" the movant "is likely to succeed on the merits." Dkt. 69 at 2. In support, the Commission cites a single unpublished district court decision from outside the Ninth Circuit. *See id.* The Commission's framing of the issue might be consistent with the view of the Southern District of Texas, but it conflicts with the established law of the Ninth Circuit.

Notably, the Commission does not refer to a single Ninth Circuit opinion dealing with administrative stays. That is because the opinions are uniformly arrayed against the Commission. When the Ninth Circuit considers the propriety of an administrative stay, it does "*not* consider

the merits of the dispute in any respect." *Doe v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019) (per curiam); *accord Al Otro Lado v. Wolf*, 945 F.3d 1223, 1224 (9th Cir. 2019) (per curiam) (emphasizing that the court's granting of an administrative stay was not based "in any respect on the merits of the dispute"); *Nat'l Urban League v. Ross*, 977 F.3d 698, 703 (9th Cir. 2020) (per curiam) (clarifying that the Court "need not wade into the underlying merits of the issues on appeal" for purposes of ruling on an administrative stay). The Commission favors the dissents issued in the above cases, in which Ninth Circuit judges took the view that administrative-stay litigation should consider the likelihood of success on the merits. *See Doe*, 944 F.3d at 1225–26 (Bress, J., dissenting); *Ross*, 977 F.3d at 705 (Bumatay, J., dissenting). But the dissents lost those debates. It is the majority opinions that are binding here, and they unequivocally indicate that it would be inappropriate to require a strong showing of a likelihood of success on the merits.

What the majority opinions turn on, rather than the merits, is the interest in preserving the status quo from unnecessary disruption while a serious case is moving forward. *See Ross*, 977 F.3d at 702 ("When considering the request for an administrative stay, our touchstone is the need to preserve the status quo."). Put another way, it is a pragmatic framework rather than a strictly legal one. *See Al Otro Lado*, 945 F.3d at 1224 (granting a temporary stay because a denial would "cause complications at the border in the period before the motion for stay pending appeal is decided"). If the need to avoid "complications at the border" is a sufficient basis for an administrative stay, the interest in fairly adjudicating a preliminary injunction in a capital case involving serious allegations of misconduct certainly is as well.

Resisting that straightforward conclusion, Defendant Bennetts creatively attempts to rewrite the definition of the term "status quo." In Defendant Bennetts' eyes, an administrative stay would in fact not preserve the status quo because Mr. Creech "is seeking to change the

nature of this case by conducting extended merits discovery." Dkt. 67 at 3. Defendant Bennetts is overthinking the situation. Today, Mr. Creech is alive. On November 13, in the absence of an administrative stay, he will be dead. The status quo that the stay preserves is Mr. Creech's life. That is neatly comparable to the status quo that was at issue in the Ninth Circuit's administrative-stay cases. In *Al Otro Lado*, for example, the key fact about the status quo was that the rule in dispute at the border had been in effect for some time, and it had been enjoined. *See* 945 F.3d at 1224. There was a ruling that would keep the policy in place, and a ruling that would disturb it. The status quo refers to the state of the world on the ground, not the nature of the litigation that will occur after a stay is granted.

To the unclear extent that Defendant Bennetts is suggesting that allowing Mr. Creech's execution is actually the path to preserving the status quo, that would be a richly ironic argument for her to make. The reason there is an execution scheduled for Mr. Creech is that Defendant Bennetts instructed one of her subordinates to walk over to a judge's chambers on October 16 with a drafted death warrant and ask him to sign it. *See* Ex. 1; *see also State v. Leavitt*, 280 P.3d 169, 171 (Idaho 2012) (describing Idaho's informal, ministerial, and ex parte process for issuing death warrants). A scheduled execution is a feature of the status quo only because Defendant Bennetts made it one. It would be passing strange if a party could establish her own status quo and then defend it against a stay by mooting the litigation with the death of her adversary.

The Commission's commentary on the timeline of this case bears scrutiny in the same regard. As the Commission sees things, Mr. "Creech has failed to present any new factual or legal claim in the more than eight months that have elapsed since the Ninth Circuit's decision." Dkt. 69 at 4. Although Mr. Creech strongly disagrees with the notion that he has no new evidence, he stresses here only that the Commission overlooks what did happen in those eight

months. Namely, that time was how long it took for Mr. Creech to persuade the courts to remove

Judge Brailsford from the case because of her friendship with Defendant Bennetts, which

happened over the Commission's strenuous objection. *See* Dkt. 38. On October 16, when

Defendant Bennetts directed a lawyer to obtain a death warrant, she and the Commission no

doubt assumed that Judge Brailsford would remain on the case, as she had to that point. They

fairly assumed that Judge Brailsford would again insulate their unconstitutional actions from any

serious judicial scrutiny by approving Mr. Creech's execution a second time. But a unanimous

Ninth Circuit thought otherwise and disqualified Judge Brailsford on the same day so that

"justice" could "satisfy the appearance of justice." Dkt. 59 at 25. There is thus an opportunity

now to make up for the appearance of injustice that has to date infected the case, and a short

administrative stay is the modest means to do so.

      DATED this 4th day of November 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz
Christopher M. Sanchez

*Attorneys for Plaintiff Thomas Eugene Creech*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of November 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Dayton P. Reed
dreed@adacounty.idaho.gov
Counsel for Defendant Bennetts

Karin Magnelli
kmagnell@idoc.idaho.gov
Counsel for Defendant Parole Commission

Rebecca Strauss
rstrauss@idoc.idaho.gov
Counsel for Defendant Parole Commission

*/s/ Hollis Ruggieri*
Hollis Ruggieri